UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-80116-CR-CANNON

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

RYAN WESLEY ROUTH,

    Defendant.
_____/

## MOTION TO SUPPRESS OUT-OF-COURT AND IN-COURT IDENTIFICATION

The Defendant Ryan Routh, through counsel, pursuant to Fed.R.Crim.P.12(b) and the Due Process Clause of the Fifth Amendment to the United States Constitution, moves to suppress the out-of-court and in-court identifications by witness T.C.M. The identification procedures used to implicate Ryan Routh in this case were impermissibly suggestive and violated his constitutional right to due process. Both the show-up identification conducted on Interstate 95 and the subsequent photographic identification procedure, where T.C.M. was shown a single photograph of Mr. Routh, were unnecessarily suggestive and created a substantial likelihood of irreparable misidentification.

### FACTS

On September 15, 2024 at 1:30 p.m., while driving to a furniture shop in West Palm Beach, T.C.M. heard three gun shots. The windows in his vehicle were up. After he turned left at the traffic light at the intersection on Congress Avenue (facing north)

to proceed west on Summit Blvd, he saw a disheveled male run from the bushes along the exterior of Trump International Golf Club and across Summit Boulevard toward a dirt parking lot. He told law enforcement that he saw a person approach a black vehicle, drop a small dark object through the sunroof, and then enter the vehicle. As T.C.M. drove past, he took three photographs of the vehicle.



T.C.M. then made a U-turn on Summit Boulevard. The black vehicle then drove east on Summit Blvd and South on Congress Avenue. T.C.M. pursued and wrote down the license plate as 97 EEE at a traffic light on Forrest Hill Boulevard. He then stopped his pursuit and turned back to the location of the shots fired. Once there, he alerted officers with the description, license plate, and photographs. T.C.M. described the suspect as a white male, 6'2" in height, light colored hair, and wearing a dark shirt and dark pants. According to Detective Gomez, T.C.M. described the male "as a younger male in his twenties." That description was sent to the surrounding law enforcement agencies with the closest being the Palm Beach County Sheriff's Office (PBSO).

Approximately an hour later and 40 miles north on I-95 near mile marker 112, Martin County Deputy Sheriffs stopped Ryan Routh, driving a 2007 black Nissan Xterra

with license plate 97EEED. The vehicle, in which Routh was stopped, did not have a sunroof.



Police shut down the highway northbound and surrounded the vehicle with numerous officers in marked police vehicles and tactical gear, as PSBO helicopter Eagle 3 watched from the sky.



Once Mr. Routh was taken into custody, he was handcuffed, and placed in the back of a Martin County Police vehicle. Mr. Routh was 58 years-old.

3



PBSO detectives spoke with T.C.M. and requested he make an identification of the suspect in custody. PBSO Detectives Brian Allison and Jose Gomez and Sergeant Patrick Hagerty escorted T.C.M to the Palm Beach International Airport where PBSO helicopter Eagle 1, which had been canvasing the golf course, flew them to Mr. Routh in Martin County. After the helicopter landed, T.C.M. was placed in the back of an unmarked police vehicle and was driven to the closed highway for a single person show-up identification of Mr. Routh, who remained on Interstate 95. According to Detective Gomez's report, "Upon seeing the detained person, [T.C.M.] notices that the person had the same hair and build. [T.C.M.] asked to see the side profile of the person and identified him as the person he saw running from the bushes along the south side of the Trump National Golf Course." This show-up identification was made at 3:41 p.m.

Routh was then taken by the PBSO/U.S. Marshals Service into a PBSO marked patrol vehicle and transported to the Palm Beach County Police station in West Palm Beach. There, police photographed him.



Six hours later, FBI agents interviewed T.C.M. They showed him a single photograph of Ryan Routh and asked him to identify him as the male he saw running near the area of the gun shots. T.C.M. agreed that was the man from this single photo line-up.

## ARGUMENT

T.C.M. identified Mr. Routh as the perpetrator through impermissibly suggestive means. First, the police utilized an inherently suggestive show-up identification procedure on Interstate 95. A show-up is inherently suggestive because the police present a single suspect to a witness thereby increasing the likelihood of misidentification. Here, the police exacerbated the suggestiveness of this procedure by presenting a suspect bound in handcuffs, in a police car, and surrounded by law enforcement. Furthermore, T.C.M. had dozens of law enforcement from numerous state and federal agencies watching him, thousands of stranded pedestrians on the highway awaiting this airlift and show-up, and knowledge that his identification was necessary in a case involving presidential candidate Donald Trump. All of these circumstances created a heightened pressure to make the identification. It would not be difficult for any well-meaning individual to identify the one, and only, person law

enforcement presented to them in this manner.

Second, following the show-up, the FBI conducted an improper photographic procedure by showing T.C.M. a single photograph of Mr. Routh. Consequently, the FBI also led T.C.M. to believe that Mr. Routh was the one, and only, suspect. These repeated, suggestive procedures created a substantial likelihood of misidentification, for which the introduction would violate Mr. Routh's right to Due Process.

Testimony concerning pretrial identifications at police staged confrontations that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" are constitutionally inadmissible. *Perry v. New Hampshire*, 565 U.S. 228, 238-40 (2012); *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Foster v. California*, 394 U.S. 440 (1969). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). A "witness' recollection of the stranger can be distorted easily by the circumstances or by later actions of the police." *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977). "[I]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on...". *United States v. Wade*, 388 U.S. 218, 229-30 (1967).

## I.     The out-of-court identification should be suppressed

The Eleventh Circuit employs a two-step analysis in assessing the constitutionality of a trial court's decision to admit an out-of-court identification. The court must consider: (1) "whether the original identification procedure was unduly

suggestive;" and, if so, (2) "whether, under the totality of the circumstances, the identification was nonetheless reliable." *United States v. Caldwell*, 963 F.3d 1067, 1075 (11th Cir. 2020) (*quoting United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001)). Evaluating the reliability of an identification involves assessing "(1) the eyewitness's opportunity to view the suspect; (2) her degree of attention; (3) the accuracy of her description; (4) her level of certainty; and (5) the length of time between the crime and her identification. *Id.* (*citing Neil v. Biggers*, 409 U.S. 188, 199 (1972)).

### A. The police used unnecessarily suggestive procedures in obtaining an out-of-court identification

#### 1. The police conducted an unduly suggestive show-up on I-95

PBSO detectives told T.C.M. that they had a detained suspect that they wanted the witness to identify. T.C.M. was transported by helicopter to the scene, where he was presented with a single individual, Ryan Routh, surrounded by law enforcement officers in a highly controlled and suggestive environment. This setting likely influenced T.C.M.'s identification, as it implied that law enforcement believed Mr. Routh to be the perpetrator. Routh, in handcuffs, was placed by himself as the only option for T.C.M. to select after helicopter transport.

#### 2. The FBI conducted a highly suggestive photographic presentation

The subsequent photographic identification procedure, where the FBI showed T.C.M. a single photograph of Mr. Routh, which now implied the FBI believed Ryan Routh was the perpetrator, compounded the suggestiveness of the initial show-up.

Showing a potential identification witness a single person and later a single photograph is both highly suggestive and unnecessary as the police can easily put

7

together a photo array. *See Manson v. Brathwaite*, 432 U.S. 98 (1977); *United States v. Dailey*, 524 F.2d 911, 914 (8th Cir. 1975). Given the potential for misidentification if suggestive procedures are employed, courts have recognized that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302 (1967)( holding that a one man show-up of a murder defendant in the hospital room of the victim's wife was unduly suggestive).

While the Supreme Court declined to adopt a "per se rule" excluding identifications that follow a single person/photo display, such identifications are only admissible only if the identification is shown to be reliable under the totality of the circumstances. *Manson*, 432 U.S. at 106. Show-up identifications are not favored as an identification procedure, but they are not per se suggestive unless the police do something to aggravate the suggestiveness of the confrontation. *Johnson v. Dugger*, 817 F. 2d 726 (11th Cir. 1987). The Eleventh Circuit has held that "the size of the array, the manner of its presentation, and the details of the photographs in the array" are relevant for determining whether a photo array was unduly suggestive. *United States v. De Andre Smith*, 967 F.3d 1196, 1203 (11th Cir. 2020). In this case, the show up was aggravated by type of transportation of the eyewitness and presentation of Mr. Routh. PBSO detectives told T.C.M. that they had a detained suspect that they wanted the witness to identify. The witness was flown by helicopter to the middle of a closed down I-95. Routh, in handcuffs, was placed by himself as the only option. And the FBI then showed a single picture of Routh. With these repeated, high-pressured, police-influenced identification tactics, any well-meaning civilian would be predisposed to make such an identification.

8

**B.     Considering all the circumstances the procedures gave rise to a substantial likelihood of irreparable misidentification in the out-of-court identifications.**

Second, under the totality of the circumstances, the identification was not reliable. "When suggestive lineup procedures cause an eyewitness identification to be unreliable, the identification 'is constitutionally inadmissible as a matter of law.'" *United States v. De Andre Smith,* 967 F.3d 1196, 1203 (11th Cir. 2020) (*quoting Caver v. Alabama*, 537 F.2d 1333, 1335 (5th Cir. 1976). The United States Supreme Court has enumerated factors a trial court may use in assessing the reliability of an out-of-court identification obtained by suggestive procedures. *Neil v. Biggers*, 409 U.S. 188 (U.S. 1972). These circumstances include the opportunity of the witness to view the suspect at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the length of time between the crime and the confrontation, the positiveness and manner of the witness' identification, and whether the witness expressed doubts about the selection or failed to identify the accused. *Id.* at 199.

Applying those factors in this case, the identification of Routh is unreliable. T.C.M. did not have ample time or opportunity to view the person running across the street. The viewing time was a matter of seconds while driving with the inherent stress of hearing gun shots, near the golf course of then presidential candidate Trump. T.C.M. only viewed the person in motion—running across a boulevard. Not surprisingly given his opportunity to view the running man, T.C.M. only gave a general description and did not identify any distinguishable or unique characteristics of the man.

Indeed, there are significant discrepancies between T.C.M.'s description and Mr. Routh's actual appearance. T.C.M. described the suspect as a younger male in his

9

twenties, whereas Mr. Routh is 58 years old, almost four decades older. Mr. Routh's clothing and the vehicle's lack of sunroof also did not match T.C.M.'s description. Yet local law enforcement and the FBI unnecessarily suggested that the detained man arrested on the highway and the single man in the photograph was the assailant. These were not reliable positive identifications. All of these circumstances give rise to a substantial likelihood of irreparable misidentification. Therefore, the out-of-court identifications should be suppressed.

II. **All in-court identifications of Mr. Routh must be suppressed due to the pretrial identifications obtained through unnecessarily suggestive procedures.**

In addition to the out-of-court identification, any in-court identification should also be suppressed. To determine whether an in-court identification would be reliable, the trial court should consider various factors including:

> the prior opportunity the witness had to observe the alleged criminal act, the existence of any discrepancy between any pretrial lineup description and the defendant's actual description, any identification prior to the lineup of another person, any identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, any time lapse between the alleged act and the lineup identification.

*United States v. Wade*, 388 U.S. 218 (1967). The Fifth Circuit has added another consideration: "any other factors raised by the totality of the circumstances that bear upon the likelihood that the witness's in-court identification is not tainted by the illegal lineup and does, in fact, have an independent source." *Frisco v. Blackburn*, 782 F.2d 1353, 1354 (5th Cir. 1986).

In this case, law enforcement engaged in unnecessary, unduly suggestive procedures to obtain the identifications of T.C.M. Whether intentional or not, T.C.M. was impermissibly pressured to identify Ryan Routh. Law enforcement flew T.C.M. by a

10

police helicopter to a major shut-down highway, with thousands of people waiting on him, to identify the one and only man surrounded by dozens of law enforcement officers. Moreover, the police presented Mr. Routh restrained in handcuffs from a marked police vehicle. He was the only option for witness T.C.M. to choose.

This tainted show-up was followed up by a suggestive single photograph line-up, which the FBI chose to use, instead of using an industry standard photo array or photo line-up. Again, Mr. Routh was the choice available for T.C.M. And now, T.C.M.'s memories were tainted by the I-95 show-up. The combination of the show-up, single photo line-up, and the minimal opportunity of T.C.M. to view the perpetrator all lead to high likelihood of contaminating the in-court recollection. After this contamination, T.C.M. cannot have an independent recollection of the offender. The significance of the impressions made by law enforcement on T.C.M.'s out of court identifications cannot be dismissed. "[W]here so many variables and pitfalls exist, the first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification at the lineup itself. The trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation…" *United States v. Wade*, 388 U.S. 218, 235 (1967). This Court should recognize that danger and suppress the impermissibly tainted out of court identifications and any future in-court identifications.

WHEREFORE, the Defendant respectfully requests that this Court grant this motion and suppress all pretrial and courtroom identifications of the Defendant by witness T.C.M.

## RULE 88.9 CERTIFICATE

Undersigned counsel has contacted Assistant United States John Shipley, who objects to this motion. Undersigned counsel also conferred with the government regarding the protective order (DE 69, ¶10), and the government does not object to the references to the discovery contained in this motion.

## REQUEST FOR HEARING

Undersigned counsel, pursuant to Local Rule 7.1(b), requests the Court to conduct a hearing on the above-styled motion. The hearing would be helpful to the Court to resolve any disputed factual issues. It is estimated that two hours is needed for the hearing.

Respectfully submitted,

HECTOR A. DOPICO
Federal Public Defender

*s/ Kristy Militello*
Kristy Militello
Assistant Federal Public Defender
Attorney for the Defendant
Florida Bar No. 0056366
250 South Australian Ave., Suite 400
West Palm Beach, Florida 33401
(561) 833-6288 – Telephone
Kristy_Militello@fd.org

*s/Renee M. Sihvola*
Renee M. Sihvola
Assistant Federal Public Defender
Attorney for the Defendant
Florida Bar Number: 116070
109 N 2nd Ave
Ft. Pierce, Florida 34950
(772) 489-2123 - Telephone
Renee_Sihvola@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/ Renee Sihvola*
Renee Sihvola