UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-80116-CR-AMC

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

RYAN WESLEY ROUTH,

    Defendant.

_____/

## AMENDED MOTION TO DISMISS UNDER THE SECOND AMENDMENT

Ryan Wesley Routh, through undersigned counsel, submits the following amended[1] Motion to Dismiss. Under the Second Amendment to the United States Constitution, the Court should dismiss Counts 4 and 5 of the Indictment. (DE 24).

### Introduction

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Amendment secures a preexisting right held by "the people" that is "exercised individually and belongs to all Americans." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). The Amendment guarantees Americans the right to "have weapons" and to carry them "outside of an organized militia." *Heller*, 554 U.S. at 582, 584 (internal quotation marks omitted). This

---

[1] Amended DE 121 to add the Local Rule 88.9 Certification.

guarantee extends to "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 582.

The Supreme Court's seminal decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) provides the governing methodology for assessing whether modern firearm regulations comport with the Second Amendment. There, the Court explained that this analysis proceeds in two steps: First, the court asks whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does, "the Constitution presumptively protects that conduct," and the court proceeds to the second step. *Id*. At that point, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. To measure consistency with traditional firearm regulations, the court asks whether a modern regulation is "relevantly similar" to historical predecessors, *id*. at 29 (quoting Cass Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)), considering "how and why the regulation[ ] burden[s] a law abiding citizen's right to armed self-defense." *Id*. When conducting *Bruen*'s history-and-tradition inquiry, "the appropriate analysis" is "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 681 (2024).

As an initial matter, Mr. Routh recognizes the government may argue that *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010) and *United States v. Dubois*, 94 F.4th 1284, 1292 (11th Cir. 2024) (cleaned up), *cert. granted, judgment vacated, and remanded*, No. 24-5744 (U.S. Jan. 13, 2025) foreclose his challenge. However

*Rozier* mistakenly relied upon *Heller*'s dicta instead of the textual holding regarding "the people" referenced in the Second Amendment. Also, *Rozier*'s dicta-based mode of analysis has not survived *Bruen*'s clarification of *Heller*'s "text and history" approach because *Rozier* never examined the text of the Second Amendment nor considered whether there was a consistent history of similar regulation dating to the Founding as *Bruen* dictates.

In *Rahimi*, the Supreme Court necessarily rejected *Dubois*'s reasoning as to why *Rozier* continues to govern post-*Bruen* and preempt further Second Amendment analysis of § 922(g)(1) cases under *Bruen*'s framework. The approach and holding of *Rozier/Dubois* have been "undermined to the point of abrogation" by *Bruen* and *Rahimi*. *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (where the Supreme Court sets forth a new "mode of analysis," it "undermines to the point of abrogation" prior circuit precedent analyzing the same or even related legal questions under a different "mode of analysis"). As such, whether § 922(g)(1) is unconstitutional as applied to Mr. Routh after *Bruen* and *Rahimi* is an open question. *See also Nat'l Rifle Ass'n v. Bondi*, No. 21-12314, 2025 WL 815734 (11th Cir. Mar. 14, 2025).

**I.  Section 922(g)(1) is unconstitutional as applied to Mr. Routh.**

**A.  The government bears the burden of showing a tradition.**

The plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1), as with § 922(g)(8). *See Rahimi*, 602 U.S. at 708–709 (Gorsuch, J., concurring). The burden thus shifts to the government to demonstrate that regulating

3

Mr. Routh's possession of a firearm is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

*Bruen* prescribed two ways of conducting the required historical tradition inquiry. Where a modern statute is directed at a "longstanding" problem that "has persisted since the 18th century," *Bruen* directed a "straightforward" inquiry: if there is no historical tradition of "distinctly similar" regulation, the regulation is unconstitutional. *Id.* at 26–28 (conducting this "straightforward" inquiry to strike down New York's restriction on public carry of firearms). However, if the statute is directed at "unprecedented societal concerns or dramatic technological changes," or problems "unimaginable at the founding," then and only then *Bruen* held, are courts empowered to reason "by analogy." *Id.* at 27. Courts in such a case ask only whether historical analogues are "*relevantly* similar." *Id.* at 28–29 (emphasis added). Notably, the "central considerations" in a "relevantly similar" inquiry are what *Bruen* called the "*how* and *why:*" "whether modern and historical regulations impose a *comparable burden* on the right of armed self-defense and whether that burden is *comparably justified*." *Id.* (emphasis added).

The Supreme Court confirmed in *Rahimi* that *both* a comparable burden *and* a comparable justification for Founding-era regulations are required in a "relevantly similar" analysis; a comparable justification alone does *not* suffice. *See Rahimi,* 602 U.S. at 693–699 (finding, from among the multitude of purported "analogues" the government proffered in its brief, *see* 2023 WL 5322645, at *13-27, that *only* "*two distinct legal regimes*" "*specifically addressed firearms violence*"—namely, only the

4

surety and going-armed laws were "'relevantly similar' *in both why and how it burdens* the Second Amendment;" explaining "the penalty" is "another relevant aspect of the burden," and "[t]he burden that Section 922(g)(8) imposes on the right to bear arms also fits within the Nation's regulatory tradition") (emphasis added); *see also id.* at 709 (Gorsuch, J., concurring) (reiterating the important methodological point that the government must show *both* a "comparable justification" *and* a comparable burden").

In choosing between *Bruen*'s two historical tradition standards here, the Court should note that in contrast to the modern problem of gun violence by domestic abusers, which *Rahimi* analyzed under the "relevantly similar" standard, *see* 602 U.S. at 698, the colonies were heavily populated with felons sent from England in 1791, and thus, the problem of felon gun violence addressed by §922(g)(1) was "longstanding."[2] Thus, the Court should rightly analyze § 922(g)(1) under the "straightforward" analysis used in both *Heller* and *Bruen*, where the challenged statutes likewise aimed to prevent interpersonal gun violence.

However, even *if* the Court were to employ the more nuanced "relevantly similar" analysis used in *Rahimi* to assess whether the government has met its burden to "establish the relevant tradition of regulation" for § 922(g)(1), *Bruen*

---

[2]*See, e.g.*, Encyclopedia Virginia, "Convict Labor during the Colonial Period," *available at* encyclopediavirginia.org/entries/convict-labor-during-the-colonial-period/(last accessed July 5, 2024) (noting that as of 1776, Virginia alone housed at least 20,000 British convicts). Notably, in 1751, Ben Franklin even wrote a satirical article entitled "Rattle-Snakes for Felons," criticizing the way England had been ridding itself of its felons by sending them to the colonies to grow their population and suggesting that rattlesnakes be sent back to England as "suitable returns for the human serpents sent us by our Mother Country." Bob Ruppert, "The Rattlesnake Tells the Story," *Journal of the American Revolution* (Jan. 2015).

dictates—and *Rahimi* confirms—that this Court must hold the government to four additional rules:

*First*, to establish a true "*tradition*" of "historical regulation," the government must point to *actual early regulations*, that is, laws or statutes—not proposals or vague "understandings" never enacted into law. *See Rahimi*, 602 U.S. at 692 (focusing on the burdens imposed by "regulations" and "laws at the founding"); *id.* at 758 (Thomas, J., dissenting) (explaining that under *Bruen*, rejected proposals "carry little interpretive weight").

*Second*, the government must then show that the same type of regulation was actually *prevalent* in the country at the Founding, that is, that the firearm regulation(s) on which it relies were "well-established and representative." "[A] single law in a single State" is not enough; instead, a "widespread" historical practice "broadly *prohibiting*" the conduct in question is required. *Bruen*, 597 U.S. at 36, 38, 46, 65 (expressing doubt that regulations in even *three* of the thirteen colonies "could suffice") (emphasis added).

*Third*, a "*longstanding*" tradition is required, and that accounts for time. Under *Bruen*, "when it comes to interpreting the Constitution, not all history is created equal" because "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," which in the case of the Second Amendment, was in 1791. *Id.* at 34. Courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* at 35. As the historical evidence moves past 1791, the less probative it becomes.

6

*Finally*, the government "bears the burden" of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 25, n. 6. They "are not obliged to sift the historical materials for evidence to sustain [a] statute." *Id.* at 60. If "history [is] ambiguous at best," the statute is unconstitutional. *Id.* at 39-40.

In short, to meet *Bruen*'s second step inquiry, the government must affirmatively present evidence of actual historical regulations that were: *not only* "comparably justified" to § 922(g)(1), *but also* imposed a "comparable burden;" sufficiently prevalent to constitute a true "tradition;" and date to the Founding. While the government was able to make such a showing in *Rahimi* because surety and "going armed" laws established a tradition of "*temporarily* disarm[ing]" an "individual *found* by a court to *pose a credible threat* to the physical safety of another," 602 U.S. at 702 (emphasis added), for the reasons described below, the government cannot meet its burden for § 922(g)(1) with any longstanding "relevantly similar" regulations here.

### B. The government cannot meet its burden for § 922(g)(1) because there is no longstanding tradition dating to the Founding of depriving *any*, and certainly *all*, felons— including non-violent ones—from possessing a firearm.

The government cannot meet its *Bruen* Step Two burden in this case for multiple reasons.

*First*, Federal law has only included a general prohibition on firearm possession by individuals convicted of crimes punishable by over a year—meaning, *for all felons—since 1961*. *See* Act To Strengthen The Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961). And a law passed 170 years after the Second Amendment's ratification cannot meet the "longstanding" requirement of *Bruen*. *Bruen*, 597 U.S. at 36-37 (emphasizing that "belated innovations" from the 20th century "come too late to provide insight into the meaning of the Constitution in [1791];" citing with approval the Chief Justice's dissent in *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 312 (2008)); *see also Bruen, id.* at 66 n.28 (declining to "address any of the 20th century historical evidence brought to bear by [the government] or their *amici*").

*Second*, even the earliest version of § 922(g)(1), which applied exclusively to certain types of *violent criminals*, and prohibited them from "*receiving*" firearms, was only enacted *in 1938*, well after the Bill of Rights was adopted (1791)—and also, to the extent it is relevant, well after the Fourteenth Amendment was enacted in 1868. *See* The Federal Firearms Act of 1938, Pub. L. No. 75-785, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938)). It was not until even later—*1968*—that Congress gave § 922(g)(1) its current form, prohibiting *all felons* from *possessing* firearms.

*Third*, as scholars and historians have long pointed out, "no colonial or state law in eighteenth century America formally restricted"—much less prohibited, *permanently and under pain of criminal punishment*—"the ability of felons to own

firearms."[3] Indeed, even before *Bruen*, judges—including then-Judge Barrett in *Kanter v. Barr*—had so recognized. *See* 919 F.3d 437, 451, 458 (7th Cir. 2019) (Barrett, J., dissenting) ("Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons," and "no[] historical practice supports a legislative power to categorically disarm felons because of their status as felons").

*Finally*, the lack of any longstanding tradition in this country of permanently disarming felons may well be explicable by the fact that at the Founding, felons—unlike many other classes of citizens in the country—were *not* exempted from militia service. Indeed, as militia members, they were not simply *permitted* to possess arms; they were actually *required* to purchase and possess arms for militia service. *See* Federal Militia Act of May 8, 1792, §§ 1-2, 1 Stat. 272 ("each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years ... *shall* severally and respectively be enrolled in the militia, and that every citizen so enrolled "*shall*, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and various other firearm accoutrements, including ammunition; exempting many classes of people from this requirement—such as "all custom-house officers"—but *not* felons). Moreover, the militia statutes of eight states

---

[3] Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374 (2009); *accord* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009); Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 291 (2021); Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009).

(Pennsylvania, Massachusetts, New York, Georgia, New Hampshire, Delaware, Maryland and Connecticut), passed shortly before or after 1791, contained similar requirements, and similarly did not exempt felons.[4]  Given this historical evidence, the government cannot show a historical tradition of gun regulation either "distinctly" or "relevantly" similar to § 922(g)(1).

### C. The historical analogues that supported § 922(g)(8) in *Rahimi* cannot support § 922(g)(1) because they were not "comparably justified," nor did they impose a "comparable burden" of disarmament *for life*.

Even *if* the government is permitted to reason "by analogy" under the "relevantly similar" standard from *Rahimi*, it still cannot meet its heavy burden here because there was no historical tradition of *any* analogous regulation in the Founding era that was *not only* "comparably justified" to § 922(g)(1), *but also* posed a "comparable burden" (*lifetime disarmament*), as *Bruen/Rahimi* requires.

The surety and going-armed statutes that *Rahimi* found proper "analogues" to the temporary ban in § 922(g)(8)(C)(i) based on a "credible threat," are ***not*** proper analogues for the lifetime ban for any and all felons in § 922(g)(1)—for obvious reasons. As a threshold matter, § 922(g)(8)(C)(i) "restricts gun use to mitigate demonstrated threats of physical violence" and applies only once a court has made

---

[4] *See* Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780, §§ III, XXI, at 146, 154 (1700-1809); Wright and Potter, 7 Acts and Laws of the Commonwealth of Massachusetts, 1780-1805, ch. 14, at 381-82,389-90 (1898); Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786, at 227-28, 232-33 (1792); Marbury, Digest of Laws of the State of Georgia, Act of December 24, 1792, §§ 9-10, at 350 (1802); Constitution and Laws of the State of New-Hampshire, Act of Dec. 28, 1792, at 251-52, 256 (1805); Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at 1134-36 (1797); Herty, Digest of the Laws of Maryland, "Militia," §§ 7, 15, 19, 20, at 367-70 (1799); and Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1, 10, at 499-500, 505-06 (1808).

an individualized finding that "a credible threat" exists. *Rahimi*, 602 at 697–698. By contrast, § 922(g)(1) is a categorical ban, prohibiting every person convicted of a felony from possessing a gun—without an individualized finding and whether or not they threaten others. And although a person subject to a surety bond received "significant procedural protections" and "could obtain an exception if he needed his arms for self-defense," that is never allowed for a felon. *Id*. at 713.

Importantly for the *Bruen/Rahimi* "comparable justification" analysis, surety statutes were intended to mitigate "demonstrated threats of physical violence"—just like § 922(g)(8)—which is why they required "individualized" findings. *Rahimi*, 602 U.S. at 693–694. But § 922(g)(1) contains *no* requirement that someone pose a threat. And "going-armed" laws likewise specifically "provided a mechanism for punishing those who had menaced others with firearms." *Id*. at 681–682. Indeed, "going-armed" laws specifically required a judicial determination that "a particular defendant ... had *threatened another with a weapon. Id.* at 699–700 (emphasis added). In other words, both of these early legal regimes criminalized specific—and serious—misconduct with a gun either in the past or expected in the near future. Section 922(g)(1), on the other hand, bans a category of people from possessing firearms whether or not they have "terrif[ied] the good people of the land," or in fact, whether they have ever used or misused a gun. *Id*. at 768.

Finally, and important for the separately-required "comparable burden" analysis—the "how" metric in *Bruen*—the Supreme Court was clear in *Rahimi* that the "penalty" is an important component of the burden imposed by a statute. *Id*. That

is why the Court repeatedly underscored that § 922(g)(8)'s restriction is "temporary"—it exists only "so long as the defendant 'is' subject to a restraining order." *Id.* at 699. And of course, in stark contrast, § 922(g)(1)'s categorical ban is *for life*. Thus both analogue regimes *Rahimi* relied on to hold § 922(g)(8) fits within our Nation's tradition of firearm regulation are distinguishable in both the "why" and the "how" from § 922(g)(1). They therefore cannot serve as proper analogues for upholding § 922(g)(1) here.

Notably, the government at no time, in any case before any court at any level in this country, has *ever* been able to identify *any* Founding-era analogue that like the surety and going-armed laws, "importantly ... targeted the misuse of firearms," **but also** categorically disarmed any citizen or any group of citizens, **for life**. *Id.* at 696. Thus, the government will never be able to satisfy both the "why" and the "how"—that is, the "comparable justification" and "comparable burden"—components of the "relevantly similar" analysis, which *Bruen* held, and *Rahimi* has confirmed, is the minimum requirement for every Second Amendment case going forward. As such, § 922(g)(1) is facially unconstitutional under *Bruen/Rahimi*. Unlike § 922(g)(8)(C)(i) it violates the Second Amendment in all circumstances. *Rahimi*, 602 U.S. at 693.

### D. Notwithstanding, all the Court needs to find here is that there is no historical tradition of permanently disarming individuals *like Mr. Routh.*

As confirmed by *Rahimi*, in a facial challenge the defendant must prove there are no set of circumstances in which the law could be applied constitutionally. *United States v. Pugh*, 90 F.4th 1318, 1325 (11th Cir. 2024); *accord Rahimi*, 602 U.S. at 693

(citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). But in an as-applied challenge, a defendant seeks only to vindicate his constitutional rights. Therefore, the Court need only determine whether a statute is unconstitutional on the facts of a particular case, or in application to the defendant. *McGuire v. Marshall*, 50 F.4th 986, 1003 (11th Cir. 2022).

The as-applied issue in this case can be easily disposed of with a fact-based ruling that there is no historical tradition to support application of § 922(g)(1) as to Mr. Routh. There is ***no tradition*** in this country to support permanent disarmament of such an individual. Mr. Routh's prior offenses do not involve conduct that harmed the physical safety of individuals in the community5. Therefore, he is similarly-situated to the plaintiff in *Range v. Att'y Gen. United States*, 124 F.4th 218, 232 (3d Cir. 2024)(en banc). The Court should hold § 922(g)(1) unconstitutional as applied to Mr. Routh after *Bruen*, as clarified by *Rahimi*.

## II.     18 U.S.C. § 922(k) is unconstitutional.

*Under Bruen*'s first step, § 922(k) regulates conduct protected by the Second Amendment's plain text. *Bruen,* 597 U.S. at 17, 24. This statute applies to "the people." *Heller*, 554 U.S. at 580. And possessing a firearm is conduct protected by the

---

5 At DE 14, ⁋ 20, the government alleged Routh's felony priors to include: 1) On or about December 20, 2002, ROUTH was convicted in Greensboro, North Carolina, of possession of a weapon of mass destruction (a "binary explosive device"), in violation of Section 14-288.8 of the North Carolina General Statutes, a class "F" felony. Class F felonies in North Carolina are punishable by terms of up to 59 months' incarceration. 2) On or about March 3, 2010, ROUTH was convicted of multiple counts of possession of stolen goods, in violation of Section 14-71.1 of the North Carolina General Statutes, a class "H" felony. Class H felonies in North Carolina are punishable by terms of imprisonment of up to 39 months' incarceration.

Second Amendment. *Id*. at 592. Furthermore, a firearm with a removed, obliterated, or altered serial number is an "Arm" within the plain meaning of that term. *See id.* at 582 (explaining that the term "Arms" "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." ). Even without  serial number, a firearm is still a "weapon[ ] of offense" that can be worn for "defence ... or use[d] in wrath to cast at or strike another." Id. at 581. Therefore, § 922(k) regulates "Arm[s]" within the plain meaning of the Second Amendment.

Because § 922(k) regulates protected conduct, the government must prove that it is consistent with our Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 18. This requires the government to reason by analogy and establish that § 922(k) is "relevantly similar" to past laws in our regulatory tradition. *Id*. at 29. As discussed above, the central considerations in this inquiry are "how" and "why" a law burdens the Second Amendment right. *Id.* The Court's ultimate objective is to determine "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 681.

A serial number is a feature that has no bearing on a weapon's functionality, therefore the government will not be able to point to a tradition of regulation. tradition of regulating dangerous and unusual weapons doesn't. *United States v. Price*, 111 F.4th 392, 430–435 (4th Cir. 2024) (en banc) (Richardson, J., dissenting). Similarly, historical regulations involving inspection and marking are not comparably justified to  § 922(k) and are not "relevantly similar." *Id*. at 435–438

(Richardson, J., dissenting). Accordingly, the conduct prohibited by § 922(k) is protected by the Second Amendment and there is not a historical tradition of firearm regulation consistent with this statute, this Court should dismiss Count 5 as facially unconstitutional.

### III.  Mr. Routh also preserves a facial challenge to § 922(g).

Although foreclosed by precedent, Mr. Routh preserves a challenge that § 922(g)(1) facially violates the Second Amendment because it imposes a sweeping, historically unprecedented lifetime ban that prevents millions of Americans from possessing firearms for self-defense. No historical regulation "impose[s] a comparable burden on the right of armed self-defense." *See Bruen*, 597 U.S. at 29.

## RULE 88.9 CERTIFICATE

Undersigned counsel has contacted Assistant United States Attorney John Shipley who objects to this motion.


Respectfully submitted,


HECTOR A. DOPICO
Federal Public Defender

*s/ Kristy Militello*
Kristy Militello
Assistant Federal Public Defender
Attorney for the Defendant
Florida Bar No. 0056366
250 South Australian Ave., Suite 400
West Palm Beach, Florida 33401
(561) 833-6288 – Telephone
Kristy_Militello@fd.org

*s/Renee M. Sihvola*
Renee M. Sihvola
Assistant Federal Public Defender
Attorney for the Defendant
Florida Bar Number: 116070
109 N 2nd Ave
Ft. Pierce, Florida 34950
(772) 489-2123 - Telephone
Renee_Sihvola@fd.org

CERTIFICATE OF SERVICE

I hereby certify that on April 7th, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/ Renee Sihvola*
Renee Sihvola