UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>24-80116-CR-CANNON/McCabe</u>

UNITED STATES OF AMERICA

v.

RYAN WESLEY ROUTH,

      Defendant.
_____/

### UNITED STATES' NOTICE OF CONVENTIONAL FILING

      The United States of America, through its undersigned counsel, hereby files this notice of conventionally filing Exhibit 1, a Federal Bureau of Investigation (FBI) firearms/toolmarks laboratory report, and Exhibit 2, a redacted copy of the Government's February 3, 2025 supplemental expert witness disclosure.[1] This Notice complies with the Court's instructions during the April 15, 2025 motion hearing in the above-styled case.

                                    Respectfully submitted,

                                      HAYDEN P. O'BYRNE
                                    UNITED STATES ATTORNEY

                By:   /s/ Christopher B. Browne
                        John C. Shipley
                        Florida Bar No. 69670
                        Christopher B. Browne
                        Florida Bar No. 91337
                        Maria K. Medetis
                        Florida Bar No. 1012329
                        Assistant United States Attorneys

---

[1]     Exhibit 2 includes a summary of the opinions to be offered by one of the Government's expert witnesses, a U.S. Marine Corps sniper and FBI Special Agent assigned to its Special Weapons and Tactics (SWAT) Team. The defense has provided notice of their intent to introduce substantially similar testimony from their own "sniper expert." Based on that disclosure, the defense will seek to explore the same subject matter as the Government, through its SWAT Team expert. The Government will file the defense's disclosure upon request by the Court.

U.S. Attorney's Office
Southern District of Florida
99 Northeast 4th Street, 8th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9111
E-mail: John.Shipley@usdoj.gov

SUE BAI
SUPERVISORY OFFICIAL PERFORMING THE
DUTIES OF THE ASSISTANT ATTORNEY
GENERAL FOR THE NATIONAL SECURITY
DIVISION

By:   */s/ James Donnelly*
James Donnelly
Court ID No. A5503331
Department of Justice, National Security Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-0849
Email: james.donnelly3@usdoj.gov


**CERTIFICATE OF SERVICE**

I **HEREBY CERTIFY** that I conventionally filed the foregoing document and Exhibits 1 and 2 with the Clerk of Court in Fort Pierce, Florida, on April 15, 2025.

*/s/ Christopher B. Browne*
Assistant United States Attorney

7-1 LIMS (Rev. 01/09/2023)

UNCLASSIFIED



# FBI Laboratory



## LABORATORY REPORT

To: Christian C. Hull  
Miami

Date: September 23, 2024

Case ID No.: ▮▮▮▮▮▮▮

Lab No.: 2024-02020-6  
2024-02020-18

Communication(s):

Agency Reference(s): ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Subject(s):

Victim(s):

Discipline(s):    Firearms/Toolmarks

This document may contain privileged and/or personally identifiable information, including information related to juveniles and other protected individuals. This document must be afforded the protection required by applicable law, regulation, and policy. If you are not the intended recipient of this document, please destroy it promptly without further retention or dissemination, unless otherwise required by law.

FBI Laboratory Evidence Designator(s):

| | |
|---|---|
| Item 1 | Rifle, serial number obliterated, from south barrier of property near Hole 5 (1B94, E7394317; Item 5) |
| Item 1-2 | Scope from Item 1 Rifle (1B94, E7394317; Item 5) |
| Item 2 | Magazine from Item 1 Rifle (1B95, E7394318; Item 5A) |
| Item 3 | Cartridges from Item 2 Magazine (1B95, E7394318; Item 5A) |
| Item 4 | Cartridge from Item 1 Rifle (1B96, E7394319; Item 5B) |
| Item 41 | Pistol with light from Agent R▮▮▮ F▮▮▮▮ (1B131, E7394328; Item 1) |
| Item 42 | Magazine from Item 41 Pistol (1B132, E7394329; Item 1B) |
| Item 43 | Cartridges from Item 42 Magazine (1B132, E7394329; Item 1C) |
| Item 44 | Cartridge from Item 41 Pistol (1B132, E7394329; Item 1A) |
| Item 45 | Magazine from Agent (1B133, E7394330; Item 2) |
| Item 46 | Cartridges from Item 45 Magazine (1B133, E7394330; Item 2A) |

Page 1 of 7

UNCLASSIFIED



AO386-C  
**GOVERNMENT EXHIBIT**  
CASE NO. 24-80116-CR-Cannon  
EXHIBIT NO. 1

- Lab Report-Released ▮▮▮▮▮.pdf

GovExp000324

UNCLASSIFIED

| | |
|---|---|
| Item 47 | Magazine from Agent (1B134, E7394331; Item 3) |
| Item 48 | Cartridges from Item 47 Magazine (1B134, E7394331; Item 3A) |
| Item 52 | FTU Secondary Evidence (6 bullets, 10 cartridge cases, 2 casts) |
| Item 115 | Cartridge case from glove box in Quadrant B of 2007 Nissan Xterra (1B10, E8395586) |
| Item 130 | Cartridge case from trail area on north side of south barrier of property near Hole 6 (1B116, E7394301; Item 23) |
| Item 131 | Cartridge case from south barrier of property near southeast corner (1B119, E7394304; Item 27) |
| Item 132 | Cartridge case from near grass line at south barrier of property near southeast corner (1B121, E7394306; Item 29) |
| Item 133 | Bullet from south barrier of property near southeast corner (1B126, E7394311; Item 34) |
| Item 134 | Bullet from south barrier of property near southeast corner (1B127, E7394312; Item 35) |

The results of the firearms and serial number restoration examinations and national database searches are included in this report.

**Results of Examinations:**

Firearms

Item 1 is a 7.62x39mm Norinco (Importer Poly USA) semi-automatic rifle, Model SKS, with obliterated serial number which functioned normally when tested in the Laboratory using the Item 2 magazine. Item 1-2 is a Crimson Trace scope with the magnification listed as 3-9x40.

Item 41 is a 9x19mm (9mm Luger) Glock pistol, Model 19 Gen 5, Serial Number DHS207123 which functioned normally when tested in the Laboratory using the Items 42, 45, and 47 magazines.

Serial Number Restoration

Examination and processing of the obliterated serial number on the Item 1 rifle restored the serial number to read "23004119 *". The asterisk represents a character that was partially restored and could be a "T", "F", "P", "Y", or "I". Additionally, obliterated numbers on the bolt carrier and the trigger guard for the Item 1 rifle were examined and processed and were restored to read "004119".

UNCLASSIFIED

Bullets

Items 133 and 134 are .38 caliber (which includes 9mm) copper jacketed hollow point bullets that were fired from a Glock Marksman Barrel (GMB) rifled with six grooves, right twist. The Item 133 bullet has no marks of value for comparison purposes. The Item 134 bullet was identified as having been fired from the barrel of the Item 41 pistol.

Cartridge Cases

Item 115 is a .45 Colt/.45 Long Colt caliber cartridge case that bears the headstamp of Hornady ammunition. Item 115 cartridge case has an irregular firing pin impression which is not consistent with commercially manufactured firing pins. It is possible this firing pin impression was produced by a handmade firing pin.

Items 130 through 132 consist of three 9x19mm (9mm Luger) cartridge cases that bear the headstamp of Speer ammunition and were identified as having been fired in the Item 41 pistol.

Ammunition

Items 3 and 4 consist of twenty 7.62x39mm cartridges loaded with steel copper washed jacketed bullets that bear the headstamp of Tulammo ammunition and are physically consistent with functional ammunition.

Items 43, 46, and 48 consist of forty-two 9mm Luger cartridges loaded with copper jacketed hollow point bullets that bear the headstamps of Speer and Hornady ammunition and are physically consistent with functional ammunition.

NIBIN

Images of a test-fired specimen from the Item 1 rifle were entered into the National Integrated Ballistic Information Network (NIBIN) and searched within the zone that includes Florida and Nationally. No associations were found at this time.

A NIBIN search was not conducted for Item 115 due to revolver-type cartridge case images not being entered into the database.

**Methods:**

Physical and Visual Examination

Physical and visual examinations compare the observable features and class characteristics of evidence items. A conclusion of "physically consistent with" is reached if the observable features or measurable dimensions and/or design features of two items are in agreement or are "physically consistent." If these dimensions and features are clearly different,

Page 3 of 7

2024-02020-6

UNCLASSIFIED

UNCLASSIFIED

an elimination conclusion is reached. If there is a lack of observable features or measurable dimensions, the result is inconclusive.

Firearms Function

The make, model, and caliber of a firearm are determined by directly observing manufacturer markings on the firearm in question. When markings are not present, published materials and reference collection firearms may be used to make determinations. Note any pertinent observations such as damage, modifications, improper assembly, accessories, missing parts, broken parts, or defects. Determine if the firearm is suitable for test firing and if so, what test firing methods are appropriate. The firearm is test fired in the received configuration and condition, using appropriate ammunition for case circumstances, and in a manner that determines the functionality of a firearm.

NIBIN

When a NIBIN entry is performed for a submitted firearm, an image of a test-fired cartridge case from that firearm is entered in the NIBIN database. An image of a representative sample of any submitted cartridge cases that have not been associated with a specific firearm are also entered in the NIBIN system. Entries are searched against the appropriate regional database(s), and correlation results are viewed to determine possible associations.

Pattern Examination

Toolmarks, whether they are present on evidence items or secondary evidence created in the Laboratory, undergo two stages of comparison. First, the class characteristics are examined and compared. If the class characteristics of the toolmarks are not clearly different, the examination moves to a second stage using comparative microscopy.

Comparative examinations of the impressed and striated toolmarks, in at least two items, are conducted to determine if patterns of similarity exist. At the completion of these comparisons, one of the following three opinions is issued:

1) Source Exclusion

Source exclusion is an Examiner's conclusion that two toolmarks did not originate from the same source. This conclusion is an Examiner's opinion that the observed difference(s) in class characteristics provides extremely strong support for the proposition that the two toolmarks came from different sources and extremely weak or no support for the proposition that the two toolmarks came from the same source. A source exclusion based on a minor difference in measured class characteristics requires a verification.

2) Source Identification

Source identification is an Examiner's conclusion that two toolmarks originated from the same source. This conclusion is an Examiner's opinion that all observed class characteristics are in agreement and the quality and quantity of corresponding individual characteristics is such that the Examiner would not expect to find that same combination of individual characteristics repeated in another source. The basis for a source identification conclusion is an Examiner's opinion that the observed class characteristics and corresponding individual characteristics provide extremely strong support for the proposition that the two toolmarks originated from the same source and extremely weak support for the proposition that the two toolmarks originated from different sources. A source identification requires a verification and is the Examiner's opinion that the probability that the two toolmarks were made by different sources is so small that it is negligible.

3) Inconclusive

Inconclusive is an Examiner's conclusion that all observed class characteristics are in agreement but there is insufficient quality and/or quantity of corresponding individual characteristics such that the Examiner is unable to identify or exclude the two toolmarks as having originated from the same source. This conclusion is an Examiner's opinion that there is an insufficient quality and/or quantity of individual characteristics to identify or exclude. Reasons for an inconclusive conclusion include the presence of microscopic similarity that is insufficient to form the conclusion of source identification, or a lack of any observed microscopic similarity.

Serial Number Restoration

Magnetic, thermal, and chemical methods may be used for the restoration of serial numbers. Conclusions regarding restored characters are made by visual examination of the restored surface under a variety of lighting conditions. Information regarding the alpha-numeric structure or the general location of serial numbers is obtained when necessary from reference sources or from firearms in the Laboratory's Reference Firearms Collection.

**Limitations:**

Physical and Visual Examination

A Physical and Visual examination is unsuitable for determining a source identification conclusion. A conclusion of "physically consistent with" signifies a restricted group source, based on class characteristics and/or observable features, from which evidence may have originated. Post-manufacture features cannot be used for elimination purposes.

Firearms Function

Function testing results describe the operability of a firearm in its current configuration and does not address the statutory requirements regarding criteria for firearms classification.

NIBIN

UNCLASSIFIED

Due to several variables regarding image capture and data entry, NIBIN searches may not always locate entries that were fired in the same firearm. Additionally, the NIBIN algorithm merely provides a sorting capability for potentially associated toolmarks represented on cartridge cases and provides no statistical confidence in possible matching results.

Pattern Examination

Firearms/Toolmark Identification is an empirical science that relies on objective measurements and a subjective comparison of microscopic marks of value. Due to variations in substrate, changes in tool working surfaces from wear, corrosion, subclass, damage, or the employment of unusual tool/work piece orientations, toolmark reproduction may be incomplete or insufficient, as a result it may not be possible for an examiner to reach a source conclusion. Additionally, some tool manufacturing methods routinely produce working surfaces that leave limited microscopic marks of value. Damaged, corroded, or fragmented items may be of little or no value for comparison purposes.

Virtual Comparison Microscopy

Virtual Comparison Microscopy (VCM) is restricted to the surface that a three-dimensional toolmark topographical instrument is capable of measuring to produce a digital reproduction. Additionally, individual characteristics may be present on the evidentiary item but may not be reproduced during a scan. This may be due to interference from lacquer/sealant, environmental damage, debris, or measuring limits for an instrument. Furthermore, physical characteristics that are not measurable, such as the metallic qualities of an item, may not be available for evaluation in the digital reproduction.

Serial Number Restoration

Except for the magnetic method, serial number restoration is a destructive examination and it is possible that the obtained results may not be reproduced in any subsequent examinations. Restored serial numbers are sometimes only visible during a portion of the reconstruction process, and are not necessarily visible at the conclusion of the process.

**Remarks:**

For questions about the content of this report, please contact Forensic Examiner Erich D. Smith at ▮▮▮▮▮▮▮

For questions about the status of your submission, including any remaining forensic examinations, please contact Erin E. Farais at ▮▮▮▮▮▮▮

The evidence, which includes secondary evidence, will be returned under separate cover. This report conforms to the "Department of Justice Uniform Language for Testimony and reports for the Forensic Firearms/Toolmarks Discipline - Pattern Examinations".

UNCLASSIFIED

This report contains the opinions and interpretations of the issuing examiner(s) and is supported by records retained in the FBI Laboratory files. Please allow a minimum of thirty days from the date of a discovery request for the FBI Laboratory to provide the related materials.

The FBI cannot ensure timely delivery of discovery requests received in less time. The work described in this report was conducted at the Quantico Laboratory.

Erich D. Smith
Firearms/Toolmarks Unit



GOVERNMENT
EXHIBIT

CASE NO. 24-80116-CR-Cannon

EXHIBIT NO. 2



U.S. Department of Justice

United States Attorney
Southern District of Florida

99 N.E. 4 Street
Miami, FL 33132
(305) 961-9100 - Telephone
(305) 530-6444 - Facsimile

February 3, 2025

Kristy Militello
Assistant Federal Public Defender
Federal Public Defender's Office
250 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401-5040

**Re:  United States v. Routh, 24-87-0116-CR-CANNON/McCabe – Further Supplemental Expert Disclosures**

Dear Ms. Militello,

    Pursuant to the Court's December 23, 2024 Order, FRCP 16(a)(1)(G), and SDFL Local Rule 88.10(o)(3), the United States provides the following supplements to previously-produced synopses of information regarding areas of expert witness testimony that it anticipates at this time. We reserve the right to modify, amend and/or augment these areas of expert testimony, and the identities and opinions of specific proposed witness(es), as the investigation proceeds and the prosecution, including information from the defense, continues to develop closer to the date of trial, consistent with the Court's Orders:

1. ████████████████████████████████████████████████████
████████████████████████████████████████████.

2. N███ S███, *Special Agent, Federal Bureau of Investigation, Special Weapons and Tactics Team*

    **Training/Qualifications:**  Special Agent S███'s statement of qualifications and past testimony are attached herein at GovExp011252-011253.

    **Summary of Testimony/Opinion and Basis:** Special Agent S███ will, as the Government indicated in its initial expert disclosure, testify from his extensive special weapons and tactical expertise and training regarding the Defendant's activities and positioning in connection with his

attempted shooting of the victim. This witness will testify regarding, among other things, the Defendant's observation point, also known as the final firing point ("FFP"); Defendant's reconnaissance, selection, measurement, and "up-armoring" of the FFP; the contents and tactical significance of Defendant's notes and Internet research relating to measurement and targeting; as well as capacity of weapons system(s) seized from the crime scene. This witness will also testify regarding how and why a vantage point is desirable for a particular target, the factors that can affect a shot, the capacity of the weapon, the quantity of ammunition that can be stored and caliber and operation of the weapons system. This witness will testify about methods employed to avoid detection and sustainment of Defendant's FFP. This witness also will define terms of art in this field.

For example:

*Location of Final Firing Point:* The position chosen by the Defendant located outside the chain link fence and in line with a mostly unobstructed view of the 6th and 7th holes as a place to wait for President Trump to arrive was a good sniper "hide," also known as a final firing point. The location chosen by Routh provided a relatively easy shot at President Trump on the 6th hole even without a "zeroed" rifle scope or with iron sights because the cart path that the President would have driven on, as well as the 6th green and hole flag, were a close distance away from his location. The 6th hole was an optimal target location from Routh's sniper hide. Additionally, Routh had a relatively unobstructed view of the 7th fairway and green and the 7th hole flag from Routh's location along the fence line.

Routh's chosen location had 360-degree concealment, and he would not have been seen by those on Summit Road or the 6th green because of the natural vegetation providing cover. The armor plates that were placed inside the tote bag and backpack attached to the fence with enough

2

space between the placement of the two bags for a clear view shooting position, the loaded firearm that contained a magazine that could contain 30 rounds of ammunition with a round already in the chamber, the safety being off, and Routh's choice to position himself outside of the golf course with his vehicle parked close by, indicate that Routh was prepared to start a gunfight in a defensible position with an easy escape route. The position taken on the outside of the golf course was optimal for Routh's ability to balance shooting with getting away without harm. Items listed by Routh including a poncho, bug spray, and "quiet" plastic show that he was willing to position himself there for long periods of time and wanted items that would permit him to do so even in adverse and changing conditions.

*The SKS Rifle:* Routh's firearm recovered from the sniper hide was a Norinco SKS rifle made in China, that had a 30 round detachable box magazine inserted into the rifle. There were 11 rounds in the magazine and one round in the chamber for a total of 12 rounds. The witness is familiar with this type of weapons platform based upon his training and experience in the field, including deployments to Afghanistan. The rifle is a gas operated semi-automatic shoulder fired weapon that shoots a 7.62 x 39 mm round. It is semi-automatic because every time the trigger is depressed a round is fired. It is gas operated because a portion of high-pressure gas from the cartridge being fired is used to power a mechanism to extract the spent case and insert a new cartridge into the chamber so the individual is not required to cycle the action manually like on a bolt action rifle. In other words, a round can be fired as fast as an individual can pull the trigger. The SKS rifle and the similar AK-47 are Soviet style weapons platforms that are relatively easy and cheap to purchase in the United States. The close location of the cart path and the green to the 6th hole, and the number of rounds in the magazine, meant that anyone with any degree of familiarity with this rifle could have hit a target at those locations, among others. Because a round

was located in the chamber, Routh had at minimum some degree of familiarity with this weapon and understood that the rifle would not have fired unless a round was in the chamber as opposed to just being loaded into the magazine and inserted into the rifle without cycling the action to insert a round. The use of a high-capacity magazine allowed more rounds to be fired at the target, and the chain link fence could have been used to stabilize the weapon for firing. According to Special Agent S█████'s training and experience Routh would have been able to acquire his target and fire all of the rounds in the magazine in a matter of seconds.

3. 

Respectfully,

*/s/ John Shipley*
Assistant United States Attorney
Southern District of Florida