UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-80116-CR-CANNON/McCabe

UNITED STATES OF AMERICA

vs.

RYAN WESLEY ROUTH,

    Defendant.
_____/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS OUT-OF-COURT AND IN-COURT IDENTIFICATION (ECF 117)**

    In a ploy to haul a citizen witness into court months before trial, the defense has moved to suppress his identification of the Defendant shortly after Routh fled his sniper hide at Trump International Golf Club. The defense goes even further, arguing the witness should be prevented from testifying at trial about what and whom he saw. They are wrong for at least three reasons.

    First, Routh has failed to assert an alibi defense. And this Court already recognized there is no serious dispute he was at the crime scene as the eyewitness says (*see* ECF No. 120). Second, even if this were a real controversy, Routh cannot meet his burden to show the identification procedures were impermissibly suggestive or that they created a substantial risk of misidentification at trial. Rather, the witness had the presence of mind to take photographs and a video of Routh's vehicle and even noted Routh's (stolen) license plate number and physical description—all *seconds* after the assassination attempt and before he approached law enforcement. There was no risk of misidentification. Third, courts in this Circuit routinely endorse the identification procedure Routh complains about because it allows identification before a suspect can alter his appearance and while the witness's memory is fresh. *See Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987). That is precisely what happened here. In fact, detectives carefully admonished the witness (in audio- and video-recorded warnings) that Routh may not be

1

the perpetrator; that the witness should not feel compelled to make a positive identification; and that the investigation would continue whether or not a positive identification was made. The witness proceeded to identify Routh with "99.9" percent certainty.

For these and the following reasons, Routh's motion and accompanying request for a pointless evidentiary hearing should both be denied.

**Facts**

This case arises out of the Defendant's calculated plan to assassinate now-President, then Major Presidential Candidate, Donald J. Trump (hereafter, "President Trump" or "the President") before he could be re-elected. Over the course of months, the Defendant – who possessed an expired Hawaii driver's license and has no ties to South Florida – intentionally plotted to kill President Trump, and took significant steps toward making that happen, culminating in his attempt to assassinate the President in West Palm Beach at the Trump International Golf Club on September 15, 2024, from a sniper hide he carefully set up, using a military-grade SKS rifle he possessed illegally. A Secret Service agent thwarted the assassination when he unexpectedly came across Routh hiding near the 6th green. Routh targeted the agent, who then fired his service weapon in Routh's direction. Routh fled.

The instant motion concerns what happened next.

As Routh emerged from the hedges surrounding the golf course and fled on foot toward the south side of Summit Boulevard, an eyewitness spotted him and continued watching as Routh crossed the street and climbed into his Black Nissan Xterra. The eyewitness, who had planned on spending his Sunday furniture stopping, was able to record the make, model, and color of the vehicle.

Using his iPhone camera, the eyewitness also took photographs and a short video of Routh driving away in the Xterra. The witness even followed Routh as he sped down Congress Avenue and then east on Forrest Hill Boulevard. There, the witness pulled alongside the Defendant and reached for a legal pad so he could write down the complete license plate number on Routh's

vehicle. The witness then returned to the crime scene where he approached a Palm Beach Sheriff's Office (PBSO) lieutenant and provided the make, model, color, and license plate number of Routh's vehicle, along with a physical description of Routh, on the piece of paper depicted below:



The witness also showed the lieutenant the pictures he had taken of Routh's vehicle. PBSO homicide detectives then formally interviewed the witness. In an audio- and video-recorded interview, he related the following, under oath:

While stopped at a redlight at the intersection of Congress Avenue and Summit Boulevard, the witness heard what sounded like three individual gunshots in quick succession. *See* Draft Transcript: Sept. 15, 2024 Recording of Witness Interview, attached hereto as Exhibit 1, at 2. The witness turned westbound onto Summit, in the direction of the gunfire, where he saw "a white blond guy coming out of the bushes there, coming and running across Summit." *Id.*

Based on Routh's body language and the fact that he was running immediately after the

sound of gunshots, the witness believed Routh may have been involved in the shooting. *Id.* The witness then went back for a second look at Routh, making a U-turn and returning to the area on Summit Boulevard where the Defendant had parked his black Nissan Xterra. *Id*. The witness did so with the intention of taking a video or photograph of Routh. *Id*. As the Defendant entered his vehicle, the witness said, it appeared as if Routh looked directly at him. *Id*. The witness correctly identified Routh's vehicle as "a Nissan Xterra" and told detectives that he followed Routh to the intersection of Forrest Hill and Congress, where he wrote down Routh's license plate. *Id*. at 3.

Detectives asked the witness to further describe the white male with blond hair. *Id*. at 4. The witness said Routh was wearing black clothing with a light-colored undershirt. *Id*. at 4. He believed Routh was in his early-to-mid-twenties and appeared to throw a black object through the roof of the Xterra, which had its windows down at the time Routh entered the vehicle. *Id*. at 4. The witness said Routh had short- to medium-length, "unkept" hair. *Id*. at 5. The witness then showed the detectives the photographs he had taken of the Xterra and explained his motivation for following Routh and taking pictures: "if someone was hit, I wanted to be able to uh, give some information about this guy" *id*. at 5-6. The witness said he would be available if law enforcement had additional questions.

Within minutes, the detectives learned that Routh had been found and stopped in neighboring Martin County. Notably, the traffic stop was initiated based solely on the witness's precise description of Routh's vehicle and license plate.[1] When officers photographed the vehicle after the stop, they noticed dark-colored, olive/gray clothing located next to where Routh was sitting:

---

[1] Routh claims that the witness's physical description of Routh (as opposed to just his vehicle) was what led to the traffic stop (Motion at 2-3). In reality, Routh was stopped at 2:09 PM—*before* detectives began interviewing the witness, as evidenced by police body camera recordings of the traffic stop and interview.



Detectives quickly contacted the witness and asked him to meet them at PBSO's aviation unit for the purpose of conducting a "show-up" with the person who had been stopped in Martin County. Rather than wait in hours of traffic, PBSO personnel and the witness flew via helicopter to the scene of the traffic stop. Once there, in an audio- and video-recorded interaction, police told the witness "we're going to show you a person, okay? And we wanna see if you recognize who this person is, okay?" *See* Draft Transcript: Sept. 15, 2024 Recording of Show-Up Identification, attached hereto as Exhibit 2, at 1. A PBSO Detective proceeded to caution the witness as follows:

> Det.: All right, so as a witness, uh, you hereby acknowledge the following, okay? The person presented may or may not be the perpetrator. You understand that?
>
> Witness: Yes, sir.
>
> Det.: Okay. You should not feel compelled to make a positive identification. Do you understand that?
>
> Witness: Yes, sir.

5

> Det.: Okay, the investigation will continue whether or not a positive identification is made. Do you understand that?
>
> Witness: Yes, sir.
>
> Det.: Okay, you should not discuss any aspect of this show-up or identification process with other witnesses; and media contact is discouraged. Do you understand that?
>
> Witness: Yes.
>
> Det.: Okay, do you understand and acknowledge all of this information?
>
> Witness: I do.

*Id*. at 2. The detectives proceeded to drive the witness to the area where Routh had been detained and asked him to "tell us whatever you know, or whatever you feel about this person, okay? *Id*. Detectives asked the witness: "Does that appear to be the individual that you saw running from the south side of the golf course across the street to the black Nissan Xterra?" To which the witness responded, "It does look like him." *Id*. at 3. The witness noted Routh had the same hair, same build, and same facial features as the man he saw fleeing the crime scene. *Id*. at 3. However, to be certain, the witness wanted to see Routh's profile, asking if he could "see him on- on the side also?" *Id*. Officers turned Routh at the witness's request, at which point the witness said "Yes, sir. Yes, sir." *Id*. When asked how confident he was that Routh was the person he saw, on a scale of 1 to 100, the witness responded "99.9." *Id*.

The identification was made just two hours after the witness spotted Routh fleeing the crime scene. *Id* at 2.

## Instant Motion

Now, Routh alleges misconduct on the part of detectives who warned the witness that he "should not feel compelled to make a positive identification." *Id*. Specifically, Routh says police "conducted an unduly suggestive show-up" identification procedure which "implied that law enforcement believed Mr. Routh to be the perpetrator." (Motion at 7). Next, the defense claims

6

that federal agents' subsequent confirmation of the witness's earlier audio- and video-recorded identification should somehow factor into this Court's analysis (Motion at 7-8).[2] Finally, Routh claims that the witness's "99.9" percent certainty is "unreliable" and that he should be silenced at trial as a consequence (9, 10-11). Thankfully, that is not the law.

## Legal Standard

To prevail on a motion to suppress an out-of-court identification, the defendant must prove that the show-up was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). This standard is applied in a two-part test: (1) whether the identification procedures were unduly suggestive, and, if so, (2) whether, under the totality of the circumstances, the identification was reliable. *See Blanco v. Singletary*, 943 F.2d 1477, 1508 (11th Cir. 1991); *see also Neil v. Biggers*, 409 U.S. 188, 198-200 (1972). Where the show-up is not unduly suggestive, there is no need to proceed to prong two and the inquiry ends. *Cikora v. Dugger,* 840 F.2d 893, 895 (11th Cir. 1988). In other words, any "potential for error" (or potential for misidentification) is left for testing "by a course of cross-examination at trial." *Simmons*, 390 U.S. at 384.

If, however, a court finds the identification procedure was impermissibly suggestive, it must then examine the identification's reliability by considering: (1) the eyewitness's opportunity to view the suspect; (2) his degree of attention; (3) the accuracy of his description; (4) his level of certainty; and (5) the length of time between the crime and the identification. *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001) (citing *Neil*, 409 U.S. at 199-200).

Finally, the movant (Routh) bears the burden of demonstrating that an identification procedure was impermissibly suggestive. *United States v. Brown*, 441 F.3d 1330, 1350 (11th Cir.

---

[2] At this stage, the Government has no intention of relying on the witness's identification of Defendant's photograph because it is duplicative of the properly admitted show-up identification conducted by police shortly after Defendant's flight from the crime scene. *See* Fed. R. Evid. 801(d)(1)(C) (providing a statement is not hearsay if "[t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement: . . . identifies a person as someone the declarant perceived earlier.").

7

2006). *See also United States v. Meyer*, 359 F.3d 820, 824 (6th Cir. 2004); *United States v. Saunders*, 501 F.3d 384, 389-90 (4th Cir. 2007).

**Argument**

**A. Routh is not entitled to discovery under the guise of a hearing.**

As an initial matter, Routh cannot seriously dispute that he was at the golf course on September 15 (*see* ECF No. 107 at 37) ("THE COURT: Can there be -- I mean, . . . , can there be any dispute that the defendant was there, physically present, on the date in question?"). And his motion concedes he is the person police caught driving a black Nissan Xterra bearing license plate number 97EEED (*see* Motion 2-3).

Why, then, is the defense challenging Routh's identification at the crime scene? Plainly, Routh wants the opportunity to question the eyewitness pre-trial. But a suppression motion is not a discovery tool. *Brown*, 441 F.3d at 1349-50; *see also United States v. Smith*, 546 F.2d 1275, 1279-80 (5th Cir. 1977)[3]; *United States Torres*, 191 F.3d 799, 810-12 (7th Cir. 1999). In fact, courts routinely deny on the papers defense motions to suppress identification testimony. In *Brown*, the defendant sought an evidentiary hearing on a motion to suppress an out-of-court identification. The district court required the defendant to produce actual "evidence supporting the notion that the government had employed suggestive techniques." 441 F.3d at 1349. When the defendant failed to do so, it denied the defendant an evidentiary hearing. *Id.* The Eleventh Circuit affirmed that decision, finding that the defendant had presented no evidence that the lineup was suggestive. *Id.*

Likewise, in *Torres*, the Seventh Circuit affirmed the district court's denial of a hearing where the defendant "did not provide any specific facts that were in dispute." 191 F.3d at 811. In doing so, the court of appeals noted that the defendant, not the government, bears the burden of

---

[3] Decisions of the United States Court of Appeals for the Fifth Circuit issued before October 1, 1981 are binding upon courts located within the territory of the United States Court of Appeals for the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*).

8

establishing an issue requiring hearing. *Id.* at 811-12. The court also observed that the motion was an attempt at obtaining pre-trial discovery and that cross-examination *at trial* was a sufficient vehicle to challenge the reliability of the identifications. *Id.* at 811.

And in this district, Judge Martinez has recognized the inherent risk that defendants might "wish[] to use the evidentiary hearing to conduct discovery regarding the line-up." *United States v. Carter*, No. 09-20470-CR-Martinez, Order ([ECF No. 130]) at 1-2 (S.D. Fla. June 30, 2010) (adopting report and recommendation denying hearing on motion to suppress photographic line-up).

That is all that's happening here. Because detectives were diligent in recording and documenting the challenged identification procedure, there can be no factual dispute about its purported suggestiveness. Moreover, the detectives conducted the procedure by the book, reading department-issued warnings to the witness, on video. *See* Exhibit 2 at 1-2; *see also* U.S. Dep't of Justice, Eyewitness Evidence: A Guide for Law Enforcement at 26-27 (1999), *available at* https://www.ojp.gov/pdffiles1/nij/178240.pdf (identifying best practices for field identification procedures). Those warnings included reassurances to the witness that the "perpetrator" may or may not be the person presented and that he should not feel compelled to make a positive identification. Exhibit 2 at 2. That was more than enough. *See, e.g.*, *United States v. White*, 38 F. App'x 426, 427 (9th Cir. 2002) ("The in-field identification procedure was not impermissibly suggestive because the officers admonished each witness that there was no obligation to identify anyone and each witness viewed the defendants independently from the other witnesses.").

For his part, Routh does not say what motive a civilian witness would have to ignore uniformed detectives or disregard their explicit instructions. And it is telling that Routh's motion does not quote, quibble, or even question the detective's videotaped admonitions—the best "evidence" on the issue of suggestiveness. *Brown*, 441 F.3d at 1349. The reason is simple; Routh is not interested in the facts of the show-up procedure. He just wants to take discovery from the

Government's eyewitness. The Court should not allow it.[4]

### B. The identification procedure was not suggestive, much less unduly so.

The Eleventh Circuit has long recognized that, when done promptly after the crime, a single-person show-up may uniquely "allow identification before the suspect has altered his appearance and while the witness' memory is fresh and permit the quick release of innocent persons." *Johnson*, 817 F.2d at 729. *See also Allen v. Estelle*, 568 F.2d 1108, 1112–13 (5th Cir. 1978) (quoting *United States v. Wilson*, 435 F.2d 403, 404-405 (D.C. Cir. 1970) ("It has been recognized that showups prompted by the need for immediate identification may 'promote fairness by enhancing reliability of the identifications and permit expeditious release of innocent subjects.'")).

To that end, "show-ups are not unnecessarily suggestive unless the police aggravate the suggestiveness of the confrontation." *Johnson*, 817 F.2d at 729. Here, the circumstances—an attempted political assassination and a fleeing suspect—clearly justified law enforcement's decision to arrange for a confrontation while the eyewitness's memory was still fresh. It is absurd to suggest that police should have indefinitely detained a civilian and "thousands" of motorists (by Routh's count) while they arranged a "Usual Suspects"-style line-up at the station house. It even appears Routh took steps to alter his appearance by removing his olive-colored shirt as he fled the scene, which further justifies the procedure used by police. *Id*.

More importantly, law enforcement did nothing to aggravate the suggestiveness of the situation. They did the opposite—cautioning the witness that the "perpetrator" may or may not be the person presented; that he should feel no pressure to make a positive identification; and that the police's criminal investigation would continue whether or not the witness identified Routh. Exhibit 2 at 2. Detectives confirmed that the witness understood each admonition. *Id*. *Cf. Masse v. Fla.*

---

[4] The Government is mindful of the Court's December 23 order setting aside time for motions hearings ([ECF No. 91] at 6). But for the reasons set forth herein (including the fact that the entire identification procedure at issue was recorded), the Court should decline to take additional evidence on the instant motion.

*Dep't Corr.*, 700 F. App'x 890, 894 (11th Cir. 2017) (finding show-up did not violate due process even when the police told the victim that they had apprehended "a suspicious car" and that the car had "given chase," because the police did not suggest that the driver was in fact the intruder or otherwise pressure the victim to make an identification). Rather than terminate the procedure as soon as the witness successfully identified Routh, the police arranged (at the witness's request) to show him at a different angle to make absolutely sure. Exhibit 2 at 3-4.

Routh's claims that the show-up was unnecessarily suggestive because he was "bound in handcuffs, in a police car, and surrounded by law enforcement" have all been flatly rejected by the Eleventh Circuit. *See Johnson*, 817 F.2d at 729 (affirming identification where the defendants were held in the back of a police car when the victim identified them); *United States v. Winfrey*, 403 F. App'x 432, 436 (11th Cir. 2010) (affirming admission of the show-up procedure where the victim remained in the officer's patrol car while "officers escorted [the defendant] out of another patrol car so that [the victim/witness] could see him"); *United States v. Walker*, 201 F. App'x 737, 741 (11th Cir. 2006) (holding show-up was not unduly suggestive when the defendant was in "unseen" handcuffs and surrounded by police during the identification); *see also United States v. Kessler*, 692 F.2d 584, 586 (9th Cir. 1982) (rejecting defendant's argument that the fact he was in handcuffs and surrounded by law enforcement at the time of the show-up made the procedure unconstitutional, and noting that "[t]he use of handcuffs or other indicia of custody will not invalidate a show-up, at least where necessary for the prompt and orderly presentation of the suspect, consistent with protection of the officers and witnesses," and further recognizing that the "large number of officers" on scene "accounted for by the crime, not by any particular interest in the show-up procedure.").

Because officers never suggested Routh was the culprit (and in fact suggested the opposite), the Court need not go further. *Cikora,* 840 F.2d at 895.

### C. The identification was reliable.

Of course, the witness's identification was reliable and corroborated by the accurate information he provided to police. As for the *Neil* factors, each one amply supports the witness's

account, including "the opportunity to view the witness at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Johnson*, 817 F.2d at 729 (quoting *Neil*, 409 U.S. at 199-200).

Here, the witness did not merely "view the person running across the street" (Motion at 9). He actually *followed* him, documenting his encounter in photographs, a video, and handwritten notes. At one point during his attempts to take a picture, the witness said, "[Routh] looked right at me." Exhibit 1 at 2. This speaks to the witness's opportunity (and commitment) to observe the Defendant as well as his degree of attention. *Johnson*, 817 F.2d at 729. *See also United States v. Whitehead*, 567 F. App'x 758, 768-69 (11th Cir. 2014) (finding identification reliable where witness was attentive during the crime and recalled specific details concerning the robbery, including what the robber was wearing, the type of gun he was carrying, and other physical details; and provided these same details to the 911 operator immediately after the robbery).

And the witness's account was accurate. His description of Routh's vehicle, including every digit of his license plate, was so detailed it allowed the authorities to stop Routh less than 45 minutes after the "shots fired" call went out over Secret Service radios. *Cf. Navarette v. California*, 572 U.S. 393, 397 (2014) (finding anonymous 911 caller's identification of a silver Ford F-150 pickup with the complete license plate number was sufficiently reliable to justify traffic stop). That same note correctly described Routh as a white, blonde male. Later, the witness described Routh's messy, unkept appearance following hours in the bushes stalking the President. The witness even approximated Routh's height within two inches of what is listed on his expired Hawaii driver's license (*see* Motion at 2).

Nevertheless, Routh claims the witness's account of him is sketchy and overly general (Motion at 9-10). But there is little for him to work with. It is true the witness believed that a slim man with dyed blond hair, who was sprinting across the street in baggy clothes, was younger than Routh's actual age. It is also possible he mistook the open window of Routh's Xterra for a

"sunroof."[5] But that's it. Defendant cites no authority for the proposition that an eyewitness's description must be exact. On the contrary, courts examine whether the identification was reliable based on the totality of the circumstances; not whether the witness got every detail right. *Diaz*, 248 F.3d at 1102.

Here (unfortunately for Routh), the witness paid very close attention to the perpetrator and his vehicle, allowing him to accurately describe Routh within minutes of their encounter. The witness even followed Routh to get a better look. All of it allowed him to provide police with the description they needed to apprehend the Defendant.

As for the last two *Neil* factors, the witness was "99.9" percent confident in his identification, which is further bolstered by his insistence on seeing Routh from an angle he was more familiar with. Exhibit 2 at 4. And he made the identification just two hours after he saw Routh flee the crime scene, while his memory was still fresh. There can be no question about the witness's reliability. *See Manson v. Brathwaite*, 432 U.S. 98, 115–16 (1977) (finding reliable identification made two days after observation and emphasizing that "[w]e do not have here the passage of weeks or months between the crime and the viewing of the photograph."); *McGee v. Estelle*, 632 F.2d 476, 478 (5th Cir.1980) (*per curiam*) (affirming identification where lineup took place within two to three hours following the robbery and witness' recollection was fresh); *Allen*, 568 F.2d at 1114 (noting no passage of substantial amount of time affecting reliability where show-up occurred within one and one-half hours after the crime); *United States v. Rodger*, 521 F. App'x 824, 830-31 (11th Cir. 2013) (affirming victim's show-up identification of the defendant was reliable where the victim stood 10 to 20 feet from the robber, paid ample attention during the robbery, accurately described the robber to the investigating officers, and identified the defendant less than two hours after the robbery, when her memory was still fresh); *Winfrey*, 403 F. App'x at 436 (same). *See also United States v. Funches*, 84 F.3d 249, 255 (7th Cir. 1996) (finding show-up four hours after robbery reliable); *United States v. Thurston*, 771 F.2d 449, 453 (10th Cir. 1985)

---

[5]  Routh's Xterra did have a latched storage compartment on the roof.

(holding identification was reliable where it occurred within four hours of the incident); *Faison v. Zahradnick*, 563 F.2d 1135, 1136-37 (4th Cir. 1977) (determining identification made four hours after robbery reliable).

### D. Routh is entitled to cross-examination, not suppression.

Routh's final request is to silence the eyewitness altogether at trial. The only authorities he cites involve defendants who were identified post-indictment and without access to counsel (Motion at 10-11). Those cases are as inapt as they are old. Here, defense counsel will get a chance to cross-examine the witness on the details of his recollection at trial (but not before). That guarantee is all the Constitution requires—especially considering the thoroughness of the identification procedure and the accuracy of the eyewitness's account. *See Simmons*, 390 U.S. 377, 384 (1968) ("The danger that use of the [pretrial identification] technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error.").

Relatedly, this Court should under no circumstances grant the drastic relief Routh is seeking. Doing so would turn the exclusionary rule on its head. Suppression, of course, is historically designed to deter police misconduct. *See United States v. Laist*, 702 F.3d 608, 615 (11th Cir. 2016) (citing *United States v. Leon*, 468 U.S. 897 (1984)). In this case, as noted, law enforcement acted professionally and with great urgency. The detectives' admonitions were even-handed, and they spared no expense ensuring that the identification procedure achieved the goals identified in *Johnson*: allowing a good Samaritan witness to identify a suspect while his memory was fresh and, if warranted, permitting the quick release of an innocent person. 817 F.2d at 729. There is simply no misconduct to deter here; suppression is unwarranted.

### Conclusion

For the foregoing reasons, the Court should reject Routh's attempt to exclude reliable eyewitness testimony, dismiss his transparent request to take the witness's deposition, and deny the motion ([ECF No. 117]).

        Respectfully submitted,

        HAYDEN P. O'BYRNE
        UNITED STATES ATTORNEY

By:    */s/ Christopher B. Browne*
        John C. Shipley
        Florida Bar No. 69670
        Christopher B. Browne
        Florida Bar No. 91337
        Maria K. Medetis Long
        Florida Bar No. 1012329
        Assistant United States Attorneys

        U.S. Attorney's Office
        Southern District of Florida
        99 Northeast 4th Street, 8th Floor
        Miami, Florida 33132-2111
        Telephone: (305) 961-9111
        E-mail: John.Shipley@usdoj.gov

        SUE BAI
        SUPERVISORY OFFICIAL PERFORMING THE
        DUTIES OF THE ASSISTANT ATTORNEY
        GENERAL FOR THE NATIONAL SECURITY
        DIVISION

By:    */s/ James Donnelly*
        James Donnelly
        Court ID No. A5503331
        Department of Justice, National Security Division
        950 Pennsylvania Avenue, NW
        Washington, DC 20530
        Telephone: (202) 514-0849
        Email: james.donnelly3@usdoj.gov

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF on April 21, 2025.

        */s/ Christopher B. Browne*
        Assistant United States Attorney