UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>24-80116-CR-CANNON/McCabe</u>

**UNITED STATES OF AMERICA**

vs.

**RYAN WESLEY ROUTH,**

       **Defendant.**

_____/

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S "AMENDED MOTION TO DISMISS UNDER THE SECOND AMENDMENT" (ECF123)

Routh's motion to dismiss Counts 4 and 5 due to the Second Amendment is without merit. Both of these charges relate to Routh's possession of a loaded SKS-style sniper rifle with an obliterated serial number in connection with his attempted assassination of President Trump and assault of a federal agent on September 15, 2024. Routh's argument that Count 4 violates the Second Amendment ignores binding Eleventh Circuit precedent; his argument on Count 5 lacks any precedent whatsoever.

## Background

This case arises out of the Defendant's calculated plan to assassinate now-President, then Major Presidential Candidate, Donald J. Trump (hereafter, "President Trump" or "the President") before he could be re-elected. The indictment alleges five crimes. Of relevance here, Count 4 alleges that Routh, a convicted felon, knowingly and unlawfully possessed a firearm and ammunition, contrary to 18 U.S.C. §922(g)(1). Count 5 alleges that Routh knowingly possessed a firearm with an obliterated serial number, contrary to 18 U.S.C. §922(k).

As set forth in the Government's motion to admit Rule 404(b) evidence (ECF122), Routh has four prior felony convictions from North Carolina, where he formerly resided: a 2002 conviction for possessing a weapon of mass destruction (WMD), and three related 2010 convictions for possessing stolen goods. At present, Routh has not stipulated to any of these

felonies, so the Government must introduce proof of them at trial.

At the status conference on December 11, 2024, defense counsel raised the possibility of filing a Second Amendment challenge in this case as one of its pre-trial motions. The Court inquired: "Wouldn't that just be foreclosed by binding precedent?" Defense counsel replied: "I think that the Eleventh Circuit has, of course, issued a ruling on this. It's still something we should file that the Court should rule on." The Court responded: "Okay. But that's not the kind of motion that is going to take a lot of time." Defense counsel said: "Agreed." *See* December 11, 2024, Status Conference Transcript at 44 (ECF 89).

## Argument

### I. **As Routh Concedes, Binding Eleventh Circuit Precedent Forecloses Any Facial Constitutional Challenge to §922(g)(1)**

Routh concedes that, according to binding precedent in this Circuit, §922(g)(1) is facially constitutional under the Second Amendment. (ECF123:15). The Eleventh Circuit held in *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010), that felons do not have a Second Amendment right to possess firearms. *See id.* at 771 (applying *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008) and holding that "statutory restrictions of firearm possession, such as § 922(g)(1), are a constitutional avenue to restrict the Second Amendment right of certain classes of people. Rozier, by virtue of his felony conviction, falls within such a class."). A district court, just like the panel of an appellate court, must follow prior Circuit precedent unless that precedent is overruled by the Supreme Court or by the court of appeals sitting *en banc*. *See, e.g., United States v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008).

### II. **Routh's Purported "As Applied" Challenge to §922(g)(1) Fails.**

Routh contends that while §922(g)(1) may be facially constitutional under binding precedent, it is unconstitutional as applied to him. Virtually the whole of this argument, however, is actually a facial challenge that does not turn on any unique circumstances relating to this Defendant, but instead rests on the idea that *Rozier* is no longer good law, and that, under more recent Supreme Court precedent, prohibiting a felon from possessing a firearm is unconstitutional.

2

Holding aside the incompatibility of this idea with the concession noted above, his argument fails. *Rozier* remains good law in this Circuit, and even under the recent Supreme Court opinions he cites, there is no Second Amendment bar to prosecuting convicted felons such as Routh under §922(g)(1).[1]

### A. *Rozier* Remains Binding Precedent and Has Not Been Abrogated.

Routh suggests that *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) and *United States v. Rahimi*, 602 U.S. 680 (2024) overrule the Eleventh Circuit's unequivocal holding in *Rozier* that §922(g) is constitutional under the Second Amendment. No Eleventh Circuit decision has agreed with him. On the contrary, several Eleventh Circuit panels have stated in unpublished opinions that *Rahimi* does not abrogate *Rozier*, just as courts including this one found that *Bruen* did not abrogate *Rozier*. *See, e.g., United States v. Cole*, 2025 WL 339894, at *4 (11th Cir. Jan. 30, 2025) ("neither *Bruen* nor *Rahimi* came close to demolish[ing] and eviscerat[ing] *Rozier's* fundamental props") (cleaned up); *United States v. Dial*, 2024 WL 5103431, at *3 (11th Cir. Dec. 13, 2024); *United States v. Young*, 2024 WL 3466607, at *9 (11th Cir. July 19, 2024) (per curiam), *cert. denied*, 2025 WL 76642 (U.S. Jan. 13, 2025).[2]

---

[1]     Routh does eventually make a one-paragraph argument at page 13 of his pleading addressing why his particular circumstances make applying §922(g)(1) to him unconstitutional. That argument is meritless. *See* Part II.B (page 6), *infra*.

[2]     The Eleventh Circuit has not yet published an opinion laying out this explanation as to why *Rozier* is compatible with *Rahimi*. The Court in 2024 published an opinion reaffirming *Rozier* after *Bruen,* although that opinion was vacated by the Supreme Court for consideration in light of the just-issued opinion in *Rahimi*. *See United States v. Dubois*, 94 F.4th 1284, 1292 (11th Cir. 2024) *vacated and remanded for further consideration in light of Rahimi*, 2025 WL 76413 (Jan. 13, 2025). *See also United States v. Pierre*, 2024 WL 5055533, at *1 (11th Cir. 2025) (reaffirming *Dubois* and *Rozier* on remand from the Supreme Court following *Rahimi*), *vacated pending Dubois' consideration of Rahimi,* 2025 WL 415200 (11th Cir. 2025).

The Eighth Circuit has held that "*Rahimi* does not change our conclusion" and has reaffirmed § 922(g)(1)'s constitutionality. *United States v. Jackson*, 110 F.4th 1120, 1122 (8th Cir. 2024). The Fourth, Fifth, Sixth, and Tenth Circuits have also affirmed § 922(g)(1)'s constitutionality post-*Rahimi*. *See Vincent v. Bondi*, 127 F.4th 1263 (10th Cir. 2025); *United States v. Contreras*, 125 F.3d 725 (5th Cir. 2025); *United States v. Hunt*, 123 F.4th 697 (4th Cir. 2025); *United States v. Morton*, 123 F.4th 492, 494 (6th Cir. 2024).

These decisions are correct, because neither Supreme Court opinion overrules *Rozier*. Neither *Rahimi* nor *Bruen* even addresses §922(g)(1). *Bruen* addressed a New York state gun carry law. *Rahimi* addressed 18 U.S.C. §922(g)(8), which prohibits persons subject to a domestic violence restraining order from possessing a firearm. Far from rejecting the constitutionality of §922(g)(1), *Rahimi* actually reiterated, albeit in dicta, language from *Heller* stating that prohibitions "on the possession of firearms by felons ... are presumptively lawful." 602 U.S. at 699 (internal quotation marks omitted).

Moreover, *Rozier* did not reply upon any analysis that the Supreme Court later repudiated in *Bruen* or *Rahimi*. *Rozier* in 2010 applied the analysis required at the time by *Heller* – a first step of examining whether the defendant's conduct was protected at all, and a second step of inquiring whether, if so, regulation of that conduct was permissible nonetheless. *Bruen's* new framework in 2022 preserved *Heller's* initial inquiry into whether conduct is plainly protected by the Second Amendment. *Bruen*, 597 U.S. at 17 (recognizing that this step is "[i]n keeping with *Heller*"). *Bruen* changed only the second inquiry: examining whether a regulation of protected conduct was permissible. *Bruen* replaced the so-called "means/ends" balancing of interests test employed in some circuits with a requirement that courts review whether a restriction is consistent with historical understanding. *Rahimi*, in 2024, further discussed the "historical understanding" requirement.

*Rozier* ruled that felons categorically were a "certain class[] of people" without firearm possession rights protected by the Second Amendment. 598 F.3d at 771. It did not undertake, or need to undertake, any second-step historical analysis. So subsequent changes in the law relating to that second-step do not undermine *Rozier's* holding or its status as binding precedent.

Simply put, neither *Bruen* nor *Rahimi* allows this Court to disregard *Rozier*. *See, e.g., Cole*, 2025 WL 339894 at *4. Neither Supreme Court decision did so expressly, because §922(g)(1) was not even at issue in those cases. Neither did so implicitly either. While otherwise-binding

4

Circuit precedent may be considered abrogated when its "mode of analysis" is undermined by a more recent Supreme Court decision, *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008), that is not the situation here.  An intervening Supreme Court decision abrogates prior precedent only if the intervening decision is both clearly on point and clearly contrary to the earlier decision; in other words, to abrogate a prior-panel precedent, the later Supreme Court decision "must demolish and eviscerate each of its fundamental props." *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022) (cleaned up).  *Bruen* and *Rahimi* did not eviscerate the "fundamental prop[]" of *Rozier*.  Just the opposite: both decisions reiterate, as did *Heller*, that felon-in-possession prohibitions are presumptively lawful. *See United States v. Reaves*, 2024 WL 4707967, at *3 (11th Cir. Nov. 7, 2024) ("*Rahimi* concerned a different subsection of §922 and again noted that felon-in-possession prohibitions are presumptively lawful, so its holding was not clearly on point and therefore could not have destroyed the fundamental props of our prior precedent." (cleaned up)).

Routh's pleading recounts a variety of reasons why *Rozier* should not be followed.  The question is moot assuming *Rozier* remains intact under the prior precedent rule, but Routh's stock arguments about the supposed failings of *Rozier* are unconvincing.  He says for example that felons are part of "the people" protected by the Second Amendment.  But the Eleventh Circuit has explained that "being a member of 'the people' to whom the Second Amendment applies as a general matter is a *necessary* condition to enjoyment of the right to keep and bear arms, but it is not alone *sufficient*." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022) (emphasis in original). "[T]he Second Amendment's text shows that it codified what the *Heller* Court called a 'pre-existing right' … and that right's particular history demonstrates that it extended (and thus extends) to some categories of individuals, but not others." *Id.* (quoting *Heller*, 554 U.S. at 592, 603).  Judge Newsom's controlling opinion for the court in *Jimenez-Shilon* recognized that "certain groups of people—even those who might be among 'the people'—may be 'disqualified from' possessing arms without violating the Second Amendment." 34 F.4th at

5

1044. Only those people with a pre-existing right to bear arm had that right protected by the Second Amendment.

Routh is also wrong to the extent he suggests that courts "must" apply the second step historical inquiry. Because *Rozier* disqualified felons from Second Amendment protection at the first step, it never needed to proceed to the second step. *Bruen* only requires a historical analysis of allowed restrictions if a defendant first establishes the threshold requirement that "the Second Amendment's plain text covers [the] individual's conduct." 597 U.S. at 24. Simply put, this Court is bound by *Rozier*, and *Rozier* defeats his challenge to §922(g)(1) whether Routh styles it as facial or as-applied.

**B. The Supposedly Benign Conduct Underlying Routh's Prior Felonies Does Not Support A Successful As-Applied Challenge to §922(g)(1).**

After twelve pages of a facial challenge to §922(g)(1) dressed up as an as-applied challenge, Routh finally on page 13 articulates an individualized reason why he thinks the statute is unconstitutional as applied to him: because his prior felonies "do not involve conduct that harmed the physical safety of individuals in the community." (ECF123:13). This argument fails for multiple reasons.

First, *Rozier* rejects the notion that a felon can make an as-applied challenge to §922(g)(1) based upon supposed underlying circumstances of his prior felonies. The Eleventh Circuit said clearly: "statutes disqualifying felons from possessing a firearm *under any and all circumstances* do not offend the Second Amendment." 598 F.2d at 771 (emphasis added). So the circumstances of Routh's felony convictions do not matter under binding precedent. *See also Flick v. Att'y Gen.*, 812 F. App'x 974, 975 (11th Cir. 2020) (unpublished) ("Flick contends that because *Rozier* was a facial constitutional challenge rather than an as-applied challenge, it does not apply to his as-applied challenge. We disagree. In *Rozier*, we specifically addressed Rozier's individual circumstances as a felon before holding that §922(g)(1) was a permissible restriction on his Second Amendment right. … Our reasoning in *Rozier* applies equally to Flick's as-applied challenge and thus forecloses it.").

6

Second, even if *Rozier* did not dispense with this subject, nothing in this Court's precedent establishes that a defendant may claim that something about his felony convictions makes applying §922(g)(1) to him unconstitutional in a way it would not for others.  Elsewhere, the vast majority of courts have flatly rejected the idea.  The Eighth Circuit in a post-*Rahimi* decision explained that "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Jackson*, 110 F.4th at 1128 (noting, e.g., that "not all early Americans who declined to swear an oath of loyalty were violent or dangerous persons," after citing such laws as historical precedents for §922(g)(1) (cleaned up)).  The Tenth Circuit likewise has refused to "draw[] constitutional distinctions based on the type of felony involved." *Vincent*, 127 F.3d at 1266.[3]

Third, to the extent we look at them, Routh's past felonies plainly demonstrate that he can "not be trusted to possess a firearm without becoming a threat to society." *United States v. Moore*, 76 F.4th 1355, 1366 (11th Cir. 2023).  Routh has a prior felony conviction for possessing a weapon of mass death and destruction (WMD).  State authorities charged Routh in April 2002 with this felony violation of North Carolina Statute 14-288.8, in Case Number 02-CRS-083088.  According to the indictment, Routh unlawfully possessed a "binary explosive device with a detonation cord and a blasting cap" – essentially, dynamite – on or about April 23, 2002.  He pleaded guilty in December 2002 to possessing a "weapon of mass death and destruction," a definition that includes any explosive or incendiary device such as a bomb or grenade or any type of weapon meant to expel a projective by means of an explosion.

The WMD conviction not only shows Routh's comfort with devices that may cause death or grave injury, but also shows that he was indeed capable of intending to do the extraordinary. Routh stands accused not just of intending to kill someone, but of intending to kill a major

---

[3]  This analysis is not controlled by the statutory interpretation cases defining "crimes of violence" or "violent felonies," but rather looks at whether Congress could decide that such people present a danger if armed.

7

candidate to be the most powerful leader in the free world.

As we have argued in our motion to admit this conviction under FRE 404(b) (ECF123): a prior conviction for possessing a weapon of mass death and destruction supports the idea that Routh was perfectly fine with the idea of committing an act of extreme violence in public causing massive public consequences. Surely a person with such a history, and a felony conviction based upon it, may constitutionally be prohibited from possessing a firearm.[4]

Perhaps recognizing the absurdity of arguing that a WMD felony conviction is benign, Routh urges the Court – in his single sentence addressing the topic – to focus upon the conduct giving rise to his convictions, and decide whether it shows conduct harming the public sufficient to justify applying §922(g)(1). Routh urges this Court to make a "fact-based ruling that there is no historical tradition to support application of §922(g)(1) as to Mr. Routh" because his "prior offenses do not involve conduct that harmed the physical safety of individuals in the community." He cites no precedent, however, for the idea that a Second Amendment challenge turns on the facts of his underlying felony convictions, let alone whether those facts "involve conduct that harmed the physical safety of individuals in the community." The lone case he cites for this view, from the Third Circuit, is inconsistent with this Circuit's binding precedent in *Rozier*, and in any event did not engage in such a deep-dive fact-based inquiry.[5] No case anywhere supports that approach.

---

[4] Routh's other felony convictions – for possessing stolen goods – also show that he is not the kind of person who should be entrusted with a firearm. District courts in this Circuit have rejected as-applied challenges by defendants with prior theft convictions. *See, e.g., United States v. Meyer*, No. 22-CR-10012-RKA, 2023 WL 3318492, at *1, *4 n.5 (S.D. Fla. 2023) (grand theft). Other district courts, too, have recognized that felons convicted of larceny offenses are among those historically recognized to present a danger if armed. *See United States v. Coombes*, 629 F. Supp. 3d 1149, 1162-63 (N.D. Ok. 2022) (citing both historical and modern authorities). Persons "convicted of a crime of theft[] present a clear example of those persons who are not to be trusted by society." *United States v. Robinson*, 2023 WL 7021320, at *7 (M.D. Pa. Oct. 25, 2023) (quotation omitted).

[5] In *Range v. Att'y Gen. United States*, 124 F.4th 218, 232 (3d Cir. 2024) (*en banc*), a divided Third Circuit found in a civil proceeding that §922(g)(1) would be unconstitutional as applied to a man whose only prior felony was for food-stamp fraud, who committed or was charged for no other crimes, and as to whom the Government had "no evidence that he poses a physical danger to others." *Range* conflicts with *Rozier* on multiple fronts, but needless to say, equating Mr.

This kind of fact-intensive as-applied challenge at the motion to dismiss phase is also disfavored because a court "would be required to make findings of fact beyond whether those facts which are alleged in the indictment." *United States v. Pettway*, 2024 WL 231843, at *4 (S.D. Ala. Jan. 22, 2024) (declining to resolve an as-applied challenge to §922(g)(1)). Routh's position would require consideration of facts beyond the mere fact of his prior convictions—including the circumstances of those convictions and his personal history. Yet, to engage in the case-by-case assessment of dangerousness that could be required for an as-applied challenge smacks of the balancing test *Bruen* rejected. It also would burden district courts with investigating the facts of a §922(g)(1) defendant's prior felony convictions – even if, as typically occurs, the defendant stipulates to those convictions for purposes of trial and takes them off the table that way.[6]

Finally, Routh's analysis pays no heed to why he possessed the rifle on September 15. He did not have it in self-defense, he did not have it to poach dinner, he did not have it to shoot wildfowl – he possessed it to shoot the man who is now President of the United States in cold blood from a sniper hide. Count 2, indeed, expressly alleges that he possessed and brandished the firearm in furtherance of a crime of violence, specifically, the attempted assassination of President Trump. Case discovery reinforces that Routh obtained and used the rifle for the unlawful purpose of killing President Trump. For Routh of all people to insist that prosecuting him for violating

---

Range's food-stamp fraud conviction with Routh's possessing a WMD, or saying that Routh's present charges and past conduct show he poses no danger to anyone, is laughable. Even if this Court could permissibly disregard *Rozier* and follow *Range*, that outlier would not aid Routh.

[6]     Routh does not actually present to this Court the facts of his prior convictions, asking the Court simply to assume that they did not involve any harm to individuals. We will not take the bait to engage in this improper inquiry – but suffice it to say that the facts of Routh's prior WMD conviction, and the threats of violence that led to this charge and discovery of the WMD, show the grave threat he posed to others if police had not intervened. *See* ECF 122:17-18. Moreover, historical analogues to North Carolina's prohibition include those regulating commerce in firearms and gunpowder and requiring the inspection and marking of gun barrels and gunpowder.

§922(g)(1) is a "burden on the right of armed self-defense" defies belief.[7]  Count 4, in short, cannot be dismissed under any label.

    C. **Although the Court need not address the topic, restrictions on felons' right to bear arms are consistent with historical tradition.**

Given *Rozier*, this Court need not engage in the academic exercise of debating whether restrictions on felons' right to bear arms are consistent with historical tradition, satisfying *Bruen's* second inquiry as clarified by *Rahimi*.  To preserve our position in the event the law changes, we explain below why restrictions on felons' right to bear arms are indeed consistent with historical tradition.  But to be clear:  Absent a change in the law, the Court may bypass the discussion in this Section, uphold Count 4 based upon *Rozier*, and proceed to Part III below (page 17, *infra*), addressing the different topic of the constitutionality of the §922(k) charge in Count 5.

*Bruen* described its historical methodology as a "legal inquiry."  597 U.S. at 25 n.6.  The government satisfies its legal burden with the following primary historical evidence of laws stripping firearm possession rights of those living outside the law, noting this record's acceptance in both legal literature and by various courts supporting §922(g)(1) both facially and as applied. District courts in this circuit have upheld §922(g)(1) on the basis of historical evidence, "[e]ven if … not bound by *Rozier*," *see, e.g.*, *Morgan*, 2023 WL 4562850, at *1 (cleaned up), and the Eighth Circuit has held on remand from the Supreme Court after *Rahimi* that "§ 922(g)(1) … 'is consistent with the Nation's historical tradition of firearm regulation.'" *Jackson*, 110 F.4th at 1126 (quoting *Bruen*, 597 U.S. at 24).

First, however, the government notes the historical standard explained in *Bruen* and *Rahimi*. The proper use of "*Heller's* methodology," as opposed to the rejected means-end test, "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right." *Bruen*, 597 U.S. 21-22. "We assessed the lawfulness of" the regulation at

---

[7]    It also reinforces why this Court should grant the Government's motion to preclude defenses echoing this improper theme, such as justification, necessity and duress. *See* ECF 119:3-8.

issue "by scrutinizing whether it comported with history and tradition." *Id.* at 22. But "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691-92. The Supreme Court in *Rahimi* noted that, "[a]s we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692.

*Bruen* noted *Heller's* reference to the understanding of the right to bear arms "'[f]rom Blackstone through the 19th-century cases, commentators and courts'" in determining whether the regulation was "'fairly supported by historical tradition.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626-27). It also described *Heller's* consideration of past regulations proffered as "historical precedent" to assess whether "each purported analogue … 'burden[ed] the right of self-defense as much as'" the ban at issue. *Bruen*, 597 U.S. at 22 (quoting *Heller*, 554 U.S. at 631-632). The Supreme Court summed up its approach, saying: "The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26.

Defendant misstates *Bruen's* historical burden in suggesting that §922(g)(1) is unconstitutional unless the government shows a tradition of distinctly similar historical regulation' as of 1791 when the Second Amendment was ratified. The Supreme Court has used various phrases to describe its approach. It looked to "'founding-era historical precedent,' including 'various restrictive laws in the colonial period'" to see if any were "analogous." *Bruen*, 597 U.S. at 22 (quoting *Heller*, 554 U.S. at 631) (emphasis added). *Bruen* "concern[ed] the same alleged societal problem addressed in *Heller*" and looked to see "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Bruen*, 597 U.S. at 27 (emphasis added). *Bruen* described how its approach could be applied in various circumstances, noting only that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is *relevant evidence* that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26 (emphasis added). As the Supreme Court

11

clarified in *Rahimi*, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations," but "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30).

Regardless of which word or phrase one pulls from *Bruen* or *Rahimi*—whether one looks for historical precedent that is comparable, analogous, consistent with, relevantly similar, or distinctly similar—legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed. That history supports §922(g)(1) ban on firearm possession by convicted felons.[8]

More generally, history reflects analogous restrictions on the right to bear arms to citizens acting within lawful society. The Eleventh Circuit recently noted that Congress's purpose in enacting §922(g)(1) was to disarm those "who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society.'" *Moore*, 76 F.4th at 1366 (quoting *Small v. United States*, 544 U.S. 385, 393 (2005)). "The Supreme Court has observed that the purpose of the Safe Streets Act, as amended by the Gun Control Act, was to curb 'lawlessness and violent crime.'" *Jackson*, 110 F.4th at 1128 (quoting *Huddleston v. United States*, 415 U.S. 814, 824 (1974)). In a pre-*Bruen*, non-§922(g)(1) case, the Eleventh Circuit recognized that the push to create what would become the Second Amendment intended "that Congress be barred from

---

[8]   Routh states in his motion: "Whether §922(g)(1) is unconstitutional as applied to Mr. Routh after *Bruen* and *Rahimi* is an open question. *See also Nat'l Rifle Ass'n v. Bondi*, No. 21-12314, 2025 WL 815734 (11th Cir. Mar. 14, 2025)." Whatever he means by that statement (since obviously no court has addressed Ryan Routh's as-applied challenge until today), *National Rifle Association* does not help him. The Court there rejected, *en banc*, a Second Amendment challenge to a Florida law prohibiting the possession of firearms by minors, as applied to persons 18-21 years old. The Court found that historical precedent supported such a regulation. The opinion does not address §922(g)(1) or mention felons or *Rozier* at all. If anything, *National Rifle Association* supports the proposition that a modern restriction need not "perfectly match a law from the Founding era," because such a requirement would "erroneously 'assume[] that founding-era legislatures maximally exercised their power to regulate." 2025 WL 815734 at *4 (*quoting Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring)).

12

prevent[ing] the people of the United States, who are peaceable citizens, from keeping their own arms." *Jimenez-Shilon*, 34 F.4th at 1048.

The following historical record shows that the Founders and founding-era legislatures understood their power to disarm those outside of lawful society, including felons. Simply because some laws chose not to disarm felons does not contradict the record showing many laws that did.

For centuries, the gun rights of certain groups have been categorically limited to promote lawful society. Some classes of people were "almost universally excluded" from exercising certain civic rights, including "the felon, on obvious grounds." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868) (cited in *Heller*, 554 U.S. at 616, as a leading authority on the subject). The Second Amendment incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183-84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (Winter 1986)).

"'Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right . . . limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." *United States v. Rene E.*, 583 F.3d 8, 15-16 (1st Cir. 2009) (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002)). "Felons 'were excluded from the right to arms' because they were deemed unvirtuous." *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012) (quoting Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995)).

"*Heller* identified as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting *Heller*, 554 U.S. at 604). That report recognized the permissibility of imposing a firearms

13

restriction on convicted criminals and did not distinguish between types of criminals, stating that "citizens have a personal right to bear arms '*unless for crimes committed*, or real danger of public injury.'" *Id.* (quoting 2 Bernard Schwartz, The Bill of Rights: A Documentary History 662, 665 (1971)) (emphasis added). Whether the report's recommendations passed Pennsylvania's convention is irrelevant. *Heller* recognized its influence on the Second Amendment, and it shows how contemporary legislators understood the scope of permissible limitations on the pre-existing right to bear arms. *See Jackson*, 110 F.4th at 1127 (citing the report as "relevant here in determining the historical understanding of the right to keep and bear arms").

During the Revolutionary War, Connecticut passed a law providing that any person who "shall libel or defame" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." Public Records of the Colony of Connecticut 193 (1890) (1775 law). And, at the recommendation of the Continental Congress, *see* 4 Journals of the Continental Congress 205 (1906) (resolution of March 14, 1776), at least six states disarmed those who refused to take an oath of allegiance to those states, *see, e.g.*, 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large; Being A Collection of All the Laws of Virginia 282 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law). *See Jackson*, 110 F.4th at 1126-27 (citing such laws). However many states chose to pass such laws, this record shows the contemporary understanding of the Continental Congress, no less, that disarmament laws were permissible.

"Many of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *Skoien*, 614 F.3d at 640. Pennsylvania, North Carolina, and Massachusetts each passed disarmament laws just after adopting right-to-bear-arms provisions in their state constitutions. *See* The Complete Bill of Rights: The Drafts, Debates,

14

Sources, And Origins 277-78 (Neil Cogan ed., Oxford University Press 2d ed., 2014).

"Early legislatures also ordered forfeiture of firearms by persons who committed non-violent hunting offenses," and "punishments for non-violent offenses involving deceit and wrongful taking of property subsumed disarmament, including death or forfeiture of a perpetrator's entire estate." *United States v. DeBorba*, 2024 WL 342546, at *13 (W.D. Wash. Jan. 30, 2024) (citing primary historical sources). *See also Jackson*, 110 F.4th at 1127 (considering such sources post-*Rahimi*). "[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019). The Eighth Circuit has recognized that if *Rahimi* considered the temporary disarmament at issue there as a lesser burden than imprisonment as a "permissible [way] to respond to the use of guns to threaten the physical safety of others," then disarmament should likewise be considered a lesser burden than death or the forfeiture of one's entire estate. *Jackson*, 110 F.4th at 1127 (quoting *Rahimi*, 602 U.S. at 699).

Even Colonial and Founding-era firearm deprivations that could be reversed, laws allowing firearm rights to be restored if the offender swore proper allegiance, or prohibitions that lapsed demonstrated the understanding of the legislatures' power "to disarm groups that it considered to be threats to the peace." *United States v. Goins*, 647 F. Supp. 3d 538, 552 (E.D. Ky. 2022). A prohibition that can later be lifted if the individual complies with the law still imposes a complete deprivation of that individual's right to bear arms while he is outside the law. *See Bruen*, 597 U.S. at 50 (comparing the burdens imposed by proffered historical precedents). Of course, § 922(g)(1) imposes no "burden [on] a law-abiding citizen's right to armed self-defense." *Id.* at 29.

In this respect, the right to bear arms is analogous to other civic rights that have historically been subject to forfeiture by individuals convicted of crimes, including: the right to vote, *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974); the right to serve on a jury, 28 U.S.C. § 1865(b)(5); and the right to hold public office, *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998). Just as Congress and the States have required persons convicted of felonies to forfeit other civic rights, § 922(g)(1) permissibly imposes a firearms disability "as a legitimate consequence of a felony conviction."

15

*Tyler v. Hillsdale Cty. Sherriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (*en banc*) (Sutton, J., concurring in judgment).

Death, confiscation of estates, or merely the loss of rights such as firearm possession, jury service, and office holding were justified because a person can lose such rights by violating "his part of the [social] contract." 4 William Blackstone, *Commentaries on the Laws of England* 375 (1769).

Defendant's observation that federal legislation disarming felons was enacted in the 20th Century is of no moment. It does not matter that this particular felon-in-possession law is "of mid-20th century vintage." *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosive*s, 700 F.3d 185, 196 (5th Cir. 2012), *abrogated on other grounds by Bruen*, 597 U.S. at 19. *Heller's* point in endorsing felon-in-possession laws was not that they had existed in their modern form since the nation's founding, but that they were sufficiently similar to historical regulations to be deemed "longstanding." *See Heller*, 544 U.S. at 626-27. As *Bruen* explained, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 597 U.S. at 30. *See Rahimi*, 602 U.S. at 692. That some militia laws included felons is similarly irrelevant. A "list of the laws that happened to exist in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically believed to be permissible by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority. "The Constitution does not impose a 'use it or lose it' view of legislative authority." *National Rifle Association*, 2025 WL 815734 at *4 (*quoting Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring)). Laws *not* disarming felons are not proof that the Founding-era legislatures believed they could not pass any.

*Bruen* acknowledged that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders," and "[a]lthough its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to

16

circumstances beyond those the Founders specifically anticipated." *Bruen*, 597 U.S. at 28. Section 922(g)(1)'s prohibition on felons possessing firearms is firmly rooted in this nation's history of disarming those that "may not be trusted to possess a firearm without becoming a threat to society." *Moore*, 76 F.4th at 1366.

III.   **Section 922(k) Does Not Violate the Second Amendment.**

Routh contends that the §922(k) charge against him in Count 5 violates the Second Amendment on its face. No case has agreed, however, and virtually all courts have rejected this argument. Most notably, in *United States v. Price*, 111 F.4th 392 (4th Cir. 2024), the Fourth Circuit sitting *en banc* found that §922(k) is constitutionally valid, reversing the district court's contrary decision. As it explained: "The Supreme Court has made clear that while the Second Amendment protects an individual right to keep and bear arms, certain arms fall outside the scope of that protection. To determine whether a regulated arm is protected by the Second Amendment, we must first ask whether it is in common use for a lawful purpose. Because we conclude that firearms with obliterated serial numbers are not, we conclude they fall outside of the scope of the Second Amendment's protection. Thus, §922(k)'s regulation of such arms does not violate the Second Amendment." *Id.* at 408.[9]

Although the 11th Circuit has not decided the issue, courts before and after *Price* endorse the Fourth Circuit's reasoning and reach the same result. *See, e.g., United States v. Gonzalez*, 2024 WL 5336649, *9 (W.D.N.Y. Nov. 13, 2024), *R&R aff'd,* 2025 WL 219111 (Jan. 1, 2025); *United States v. Brabham*, 2024 WL 3165467, *5 (M.D. Pa. 2024) ("[t]his court joins the majority of district courts that have addressed this issue to date, and concludes that the conduct prohibited by § 922(k) is not within the scope of the plain text of the Second Amendment"); *United States v. Alberts*, 2024 WL 1486145, *4 (D. Mont. 2024) ("[§] 922(k) is constitutional at Bruen step 1 because the plain text of the Second Amendment does not protect the prohibited conduct –

---

[9]   Routh's motion does not address this analysis, citing only language from one dissenting opinion in that case.

possessing a firearm with an obliterated serial number"); *United States v. Sing-Ledezma*, 706 F. Supp. 3d 650, 657 (W.D. Tx. 2023) ("[b]ecause 922(k) prohibits only the possession of highly unusual weapons, it falls outside the ambit of the Second Amendment's protection") (internal quotations omitted); *United States v. Dangleben*, 2023 WL 6441977, *7 (D.V.I. 2023) ("[t]he [c]ourt holds that the regulated conduct under Section 922(k) falls outside the scope of the Second Amendment"); *United States v. Avila*, 672 F. Supp. 3d 1137, 1144 (D. Colo. 2023) ("[l]ike numerous other courts around the country have held post-*Bruen*, the [c]ourt concludes that § 922(k) does not implicate the Second Amendment").[10]

These decisions make sense. As the Fourth Circuit explained, there is simply "no compelling reason why a law-abiding citizen would use a firearm with an obliterated serial number […] such weapons would be preferable only to those seeking to use them for illicit activities." 111 F.4 at 406 (citations and quotation marks omitted). There is also no "common-sense reason for a law-abiding citizen to want to use a firearm with an obliterated serial number for self-defense." *Id.* at 408. Accordingly, Congress had constitutionally-sound reasons for regulating firearms possession as it did in §922(k).

---

[10] *United States v. Trujillo*, 670 F. Supp. 3d 1235, 1241 (D.N.M.) ("[t]he [c]ourt holds that the conduct proscribed by § 922(k) is not protected by the text of the Second Amendment"), appeal dismissed, 2023 WL 5093358 (10th Cir. 2023); *United States v. Walter*, 2023 WL 3020321, *5 (D.V.I. 2023) ("Section 922(k)'s conduct is not protected by the Second Amendment"); *United States v. Dixson*, 2023 WL 7416327, *5 (E.D. Mo.) ("the restriction §922(k) imposes has no bearing on one's ability to exercise their Second Amendment right to self-defense"), report and recommendation adopted by, 2023 WL 7102115 (E.D. Mo. 2023); *United States v. Bradley*, 2023 WL 2621352, *3 (S.D. W. Va. 2023) ("[b]ecause §922(k) regulates a class of guns defined solely by a nonfunctional characteristic, the regulation is outside the scope or text of the Second Amendment") (internal quotations omitted); *United States v. Serrano*, 651 F. Supp. 3d 1192, 1210 (S.D. Cal. 2023) ("[t]he [c]ourt finds that the Second Amendment's plain text does not cover the conduct regulated by §922(k)"); *United States v. Tita*, 2022 WL 17850250, *7 (D. Md. 2022) ("transporting or possessing a gun with an obliterated serial number is outside the Second Amendment's scope, and [Section] 922(k) is therefore not unconstitutional"); *United States v. Reyna*, 2022 WL 17714376, *5 (N.D. Ind. 2022) ("[Section] 922(k)'s regulated conduct is outside the scope of the Second Amendment"); *United States v. Holton*, 639 F. Supp. 3d 704, 710 (N.D. Tx. 2022) ("[t]his [c]ourt does not believe that a law requiring serial numbers on firearms infringes on the right to keep and bear arms").

Section 922(k) is also consistent with, in *Bruen*'s lingo, "the Nation's historical tradition of firearm regulation." *See, e.g., Gonzalez*, 2024 WL 5336649 *10-11 (describing the "colonial-era laws demonstrate[ing] a history of regulating who could possess firearms and show[ing] the beginnings of legislative efforts to track firearms, which operate to achieve the same purposes as [Section] 922(k)" (cleaned up)).   Other courts have made the same point. *See, e.g., United States v. Barnes*, 2024 WL 3328593, *6 (D. Del. 2024) ("I find the historic evidence sufficient to show a history and tradition of marking firearms, as well as punishing the removal of the markings[;]"); *Sing-Ledezma*, 706 F. Supp. 3d at 658 ("[t]he regulations cited by the [g]overnment, although not identical in motivation or method, share distinct similarities with § 922(k): they require firearms to bear a nonintrusive permanent marking to convey their safety and help authorities trace responsible parties if they later cause harm").[11]

In summary, no precedent or persuasive reasoning supports Routh's argument that the Second Amendment's right to bear arms prevents Congress from criminalizing the possession of a firearm with an obliterated serial number.  We rely upon the reasoning of *Price* and virtually every other court in asking this Court to uphold §922(k)'s facial constitutionality.

## Conclusion

For all of the foregoing reasons, the Court should deny the Defendant's motion to dismiss

---

[11] *Dixson*, 2023 WL 7102115 at *3 ("numerous courts since *Bruen* have found Section 922(k) to be consistent with the historical tradition of firearms regulations[;] ... [t]he [c]ourt agrees with the reasoning of these cases"); *Dangleben*, 2023 WL 6441977 at *9 ("[c]olonial legislatures [devised] crude, broad laws intended to keep track of firearms and prevent such arms from reaching dangerous hands[;] ... [t]herefore, the historical regulations discussed above can be viewed as an antecedent to Section 922(k)"); *Sharkey*, 693 F. Supp. 3d at 1008 ("[l]aws mandating the marking of gun barrels and gunpowder were primarily crafted with the intention of safeguarding citizens from potential explosions and providing a means to trace hazardous barrels or powder back to the original inspector who affixed the markings[;] ... [w]hile § 922(k) does not precisely mirror these historical regulations, the *Bruen* Court was clear that the [g]overnment need only identify a historical analogue, not a historical twin); *Bradley*, 2023 WL 2621352 at *5 ("[d]espite some differences between these historical regulations and 922(k), founding-era legislatures were concerned about the illegal trading and movement of firearms, while also concerned about preventing the sale of firearms to those deemed dangerous – a shared purpose of 922(k)").

Counts 4 and 5.

                        Respectfully submitted,

                        HAYDEN P. O'BYRNE
                        UNITED STATES ATTORNEY

By:    /s/ *John Shipley*
        John C. Shipley
        Florida Bar No. 69670
        Christopher B. Browne
        Florida Bar No. 91337
        Maria K. Medetis Long
        Florida Bar No. 1012329
        Assistant United States Attorneys

        U.S. Attorney's Office
        Southern District of Florida
        99 Northeast 4th Street, 8th Floor
        Miami, Florida 33132-2111
        Telephone: (305) 961-9111
        E-mail: John.Shipley@usdoj.gov

        SUE BAI
        SUPERVISORY OFFICIAL PERFORMING THE
        DUTIES OF THE ASSISTANT ATTORNEY
        GENERAL FOR THE NATIONAL SECURITY
        DIVISION

By:    /s/ *James Donnelly*
        James Donnelly, Trial Attorney
        Court ID No. A5503278
        Department of Justice, National Security Division
        950 Pennsylvania Avenue, NW
        Washington, DC 20530
        Telephone: (202) 514-0849

## **CERTIFICATE OF SERVICE**

        The Government filed the foregoing document with the Clerk of the Court using CM/ECF on April 21, 2025.

                        /s/ *John C. Shipley*
                        Assistant United States Attorney