UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 24-80116-CR-CANNON

**UNITED STATES OF AMERICA**,

    Plaintiff,

v.

**RYAN WESLEY ROUTH,**

    Defendant.
_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS OUT-OF-COURT AND IN-COURT IDENTIFICATION

**THIS MATTER** comes before the Court upon Defendant's Rule 12(b)(3)(C) Motion to Suppress Out-of-Court and In-Court Identification under the Due Process Clause of the Fifth Amendment (the "Motion") [ECF No. 117]. The Court has reviewed the Motion, the United States' Opposition and attachments [ECF Nos. 135, 135-1, 135-2], and Defendant's Reply and attachment [ECF Nos. 141, 141-1]. The Court also held a non-evidentiary hearing on the Motion [ECF No. 158]. Upon review, the Motion is **DENIED** because the show-up identification procedure was not unduly suggestive, and in any event, the show-up identification was reliable under the totality of the circumstances. The Court exercises its discretion to resolve this Motion without an evidentiary hearing because Defendant has not raised any material dispute of fact, and the facts alleged in the Motion do not warrant the grant of relief.[1]

---

[1] Defendant maintains the full presumption of innocence. Nothing in this Order should be construed as inconsistent with that presumption.

## FACTUAL BACKGROUND

Defendant seeks to suppress a show-up identification and subsequent photo presentation made by a civilian witness ("T.C.M.") on September 15, 2024, the date of the alleged offenses [ECF No. 117; *see* ECF No. 21 (Indictment)]. Defendant also seeks to preclude T.C.M. from offering an in-court identification at trial [ECF No. 117]. The factual background contained in the Motion and in the Opposition, along with the accompanying transcripts of the show up and T.C.M.'s pre-show up sworn statement [ECF Nos. 135-1, 135-2], present the following facts, to which no critical dispute has been lodged [ECF No. 117 pp. 1–5; ECF No. 135 pp. 2–6].

At approximately 1:30 p.m. on September 15, 2024, T.C.M. was driving near the Trump International Golf Club in West Palm Beach, Florida, with his car windows up, when he heard what he thought were three gunshots. He saw a "pretty unkept" white man run from the bushes lining the exterior of the golf course [ECF No. 135-1 p. 6]. He then witnessed the man cross the street toward a parking lot, drop a black object through what T.C.M. described as the sunroof of a parked black Nissan Xterra, and get into the car. Based on the man's "body language and how he was running," T.C.M. felt that the man had done something "he did not have any business [doing]" and decided to follow the vehicle for a few blocks so T.C.M. could provide some information about the shooting [ECF No. 135-1 pp. 3–4]. In the course of doing so, T.C.M. used his phone to take three pictures of the vehicle and record a short video of the vehicle. T.C.M. also wrote down the license plate number (97EEED), along with the make, model, and color on a piece of paper [ECF No. 135 p. 3]. On that same paper, T.C.M. wrote "blonde, white, male" [ECF No. 135 p. 3].

After following the vehicle for a brief period, T.C.M. decided to return to the location of the shots fired. When he got back to the scene, he saw Secret Service presence and several police cars. T.C.M. then verbally relayed the information he gathered to law enforcement on scene. Shortly thereafter, also at the scene, a detective interviewed T.C.M. [ECF No. 135-1]. As taken

from a transcript of the sworn interview attached to the United States' Opposition, T.C.M. described the events above, noting that when he took the pictures, "it looked as if [the individual] looked right at me" [ECF No. 135-1 p. 3].[2] T.C.M. also identified that the fleeing individual wore a light colored shirt;[3] was in his early- to mid-twenties; and was a white male with blonde, unkept hair [ECF No. 135-1 pp. 5–6].

At 2:09 p.m., before the start of T.C.M.'s sworn statement, Martin County Deputy Sheriffs stopped a black Nissan Xterra with license plate number 97EEED on I-95, about 40 miles north of the golf course. Police arrested Defendant, who was driving the car; surrounded the vehicle with numerous officers; and shut down the interstate northbound [ECF No. 117 p. 3]. Police then promptly arranged to conduct a "show-up" with T.C.M. To do so without delay, they escorted T.C.M. to the police aviation unit, flew T.C.M. via helicopter to the location of the traffic stop on I-95, and then drove T.C.M. in a police vehicle to Defendant's location.

At 3:35 p.m., before conducting the show-up, police gave a series of instructions to T.C.M. as memorialized in a written transcript of body camera footage [ECF No. 135-2]. Police cautioned T.C.M. that the person that he would be shown "may or may not be the perpetrator"; that T.C.M. should not feel compelled to make a positive identification; and that the investigation would continue whether or not a positive identification was made [ECF No. 135-2 p. 3]. T.C.M. confirmed his understanding of these instructions.

At 3:41 p.m., with Defendant standing outside of a police vehicle next to a deputy on I-95, police asked T.C.M. the following question: "Does that appear to be the individual that you saw running from the south side of the golf course across the street to the black Nissan Xterra?" [ECF No. 135-2 p. 4]. T.C.M. answered as follows—"It does look like him"—noting the "same

---

[2] T.C.M. did not take a photograph of the individual himself [ECF No. 135-1 p. 7].

[3] T.C.M. could not identify the specific light color of the man's shirt [ECF No. 135-1 p. 5].

hair, same build," "same facial features" [ECF No. 135-2 p. 4]. Police then started to put Defendant back in the car, at which point T.C.M. asked if he could "see him on the side also?" [ECF No. 135-2 p. 4 ("Just want to be sure.")]. Defendant turned to the side, following which T.C.M. answered: "Yes sir. Yes, sir" [ECF No. 135-2 p. 4]. The police reiterated that T.C.M. should "take all the time that [he] need[s]," and that "there's no rush here" [ECF No. 135-2 p. 4]. When asked how confident T.C.M. was that Defendant was the person he saw, T.C.M. responded "99.9" on a scale of 1 to 100 [ECF No. 135-2 pp. 4–5]. This show-up was completed about two hours after T.C.M. spotted Defendant running away from the golf course.

After the show-up, police transported Defendant to the police station and photographed him. About six hours later, FBI agents interviewed T.C.M.; showed him a single photograph of Defendant; and asked if the man in the photograph was the man T.C.M. saw fleeing. T.C.M. agreed. The United States does not seek to introduce evidence of the photo presentation at trial, and this Order accepts and enforces that representation [ECF No. 135 p. 7 n.2; ECF No. 158 p. 36].

## LEGAL STANDARDS

An identification procedure violates the Due Process Clause of the Fifth Amendment and warrants suppression if it is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). Trial courts apply a two-step test to determine the admissibility of an out of court identification. *See United States v. Smith*, 967 F.3d 1196, 1203 (11th Cir. 2020). First, the Court asks whether "'the original identification procedure was unduly suggestive.'" *Id.* (quoting *United States v. Brown*, 441 F.3d 1330, 1350 (11th Cir. 2006)). "[S]how-ups are not unnecessarily suggestive unless the police aggravate the suggestiveness of the confrontation." *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987). Only if the Court concludes that the identification was unduly suggestive need it "consider 'whether, under the totality of the circumstances, the identification

4

was nonetheless reliable.'" *Smith*, 967 F.3d at 1203 (quoting *United States v. Perkins*, 787 F.3d 1329, 1344 (11th Cir. 2015)). The Court considers the *Biggers* factors—discussed further below—on step two. *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001). *See also Cikora v. Dugger*, 840 F.2d 893, 895–96 (11th Cir. 1988) ("If we conclude that the photo array was not impermissibly suggestive, we need not proceed to the five factors of the *Neil v. Biggers* test.").

With respect to applicable burdens, a defendant bears the initial burden to establish that the identification procedure was unduly suggestive. *See United States v. Wade*, 388 U.S. 218, 240 n.31 (1967); *United States v. Washington*, 714 F.3d 962, 966 (6th Cir. 2013); *Eng. v. Cody*, 241 F.3d 1279, 1282 (10th Cir. 2001); *see generally United States v. de la Fuente*, 548 F.2d 528, 534 (5th Cir. 1977). If a defendant meets that initial burden, the government must show that the identification was reliable under the totality of the circumstances. More generally, "[a] motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985); *id.* ("[T]he motion must allege facts which, if proven, would provide a basis for relief.").

## DISCUSSION

**A. Defendant has not raised any disputed issues of fact that require resolution in an evidentiary hearing**.

The Supreme Court has rejected a per se rule requiring a court to hold an evidentiary hearing "whenever a defendant contends that a witness' identification of him was arrived at improperly." *Watkins v. Sowders*, 449 U.S. 341, 342 (1981); *see United States v. Beard*, 761 F.2d 1477, 1480 (11th Cir. 1985) ("A district court is not required to hold an evidentiary hearing on a pretrial motion."); *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985); *United States v. Horne*, 198 F. App'x 865, 870 (11th Cir. 2006). In doing so, the Supreme Court explained that it would not "abandon[] the time-honored process of cross-examination as the device best

suited to determine the trustworthiness of testimonial evidence." *Watkins*, 449 U.S. at 349; *see also Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) ("We are content to rely upon the good sense and judgment of American juries," which "are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.").

This Court thus has discretion to decide whether to conduct an evidentiary hearing, which is unnecessary "where none of the critical facts are in dispute and the facts as alleged by the defendant if true would not justify the relief requested." *Brown*, 441 F.3d at 1350 (quoting *United States v. Smith*, 546 F.2d 1275, 179–80 (5th Cir. 1977)); *Richardson*, 764 F.2d at 1527 ("A court need not act upon general or conclusory assertions founded on mere suspicion or conjecture, and the court has discretion in determining the need for a hearing.") (citing *United States v. Harrelson*, 705 F.2d 733 (5th Cir. 1983)); *see United States v. Torres*, 191 F.3d 799, 811 (7th Cir. 1999) (affirming denial of evidentiary hearing on pre-trial motion to suppress identification where defendant "did not provide any specific facts that were in dispute"); *United States v. Gershman*, 31 F.4th 80, 94 (2d Cir. 2022).

No evidentiary hearing is necessary here because Defendant raises no disputed material facts, and the facts alleged would not provide a basis for relief. Other than one conclusory, speculative, and indefinite line at the end of the Motion that a "hearing would be helpful to the Court to resolve *any* disputed factual issues," Defendant does not identify any actual disputed facts in his Motion [ECF No. 117 p. 12 (emphasis added)]. That formulation is telling. Nor does he raise any critical facts in Reply, simply listing various topics he seeks to explore regarding T.C.M.'s identification—and then insinuating the possibility of discovering additional evidence at an evidentiary hearing [ECF No. 141 pp. 7–8]. But none of these topics for exploration, listed for the first time in Reply, creates an actual factual dispute necessitating an evidentiary hearing on the Motion. The first topic—"specific circumstances surrounding the show-up," including what police

said to T.C.M. [ECF No. 141 p. 7]—is merely an invitation to speculate and a request to investigate, not a sufficiently definite, nonconjectural fact [*see* ECF No. 158 p. 30 (defense counsel acknowledging speculative nature of inquiry)].[4] *See generally Richardson*, 764 F.2d at 1527. The second and third topics—seeking information regarding the distance between T.C.M. and Defendant at the point of initial flight (before T.C.M. interacted with law enforcement) and then leading up to and during the show-up [ECF No. 141 p. 8; *see* ECF No. 158 p. 39]—do not generate factual disputes on purported police suggestiveness and indeed are ripe for cross-examination at trial in the traditional course. The fourth "factual dispute"—a request for the exact instructions given to T.C.M. during the subsequent photo presentation—is similarly a request to investigate pre-trial, not a specific factual dispute, and it is moot anyway given the United States' decision, enforced herein, not to use that evidence. Finally, the fifth topic—T.C.M.'s "initial level of certainty and confidence of his description of the suspect, prior to the show-up" [ECF No. 141 p. 8]—is likewise a discovery request as framed, not a dispute of fact. And more generally, T.C.M.'s level of certainty beyond what he already indicated in his interview ("99.9") is an area for the jury to consider in determining how much weight to give to his testimony.

Defendant may, of course, cross examine T.C.M. on these issues and make appropriate argument to the jury regarding any doubts as to the accuracy of the identification. *Watkins*, 449 U.S. at 348; *Brathwaite*, 432 U.S. at 113 n.14. But Defendant has not raised any non-conjectural, actual factual disputes required to be resolved at an evidentiary hearing. A hearing on a motion to suppress is not a tool to obtain pre-trial discovery.

---

[4] The United States provided to Defendant body cam footage of the interview and show-up [ECF No. 76-3 p. 9 (response to standing discovery order); ECF No. 158 pp. 38–41].

**B. The show-up was not unduly suggestive**.

Courts have found that show ups held at or near crime scenes, without aggravating police conduct, are not unnecessarily suggestive in violation of due process. *See Johnson*, 817 F.2d at 729. This is because "immediate confrontations allow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons." *Id.* Defendant nonetheless argues that police created a highly suggestive environment by transporting T.C.M. to the I-95 scene via helicopter (and then by car to the highway itself), where a single individual was surrounded by law enforcement, in handcuffs, while the northbound interstate was blocked off [ECF No. 117 p. 7]. The United States responds that various courts have permitted show ups despite significant police presence and handcuffs, and moreover, that police appropriately cautioned the witness before the show-up, thus doing the opposite of aggravating any suggestiveness [ECF No. 135 pp. 10–11].

The Court agrees with the United States that the show up was not unduly suggestive.

First, the fact that Defendant was in police custody, in handcuffs, and/or surrounded by law enforcement does not necessarily make the procedure unduly suggestive. *E.g.*, *Johnson*, 817 F.2d at 729 (show up of defendant in police car immediately following robbery not impermissibly suggestive); *Masse v. Sec'y, Fla. Dep't of Corr.*, 700 F. App'x 890, 894 (11th Cir. 2017) (show up of defendant surrounded by four or five police officers not suggestive when "police did not suggest that [the defendant] was in fact the intruder or otherwise pressure [the witness] to make an identification"); *United States v. Walker*, 201 F. App'x 737, 741 (11th Cir. 2006) (rejecting claim of impermissible suggestiveness where suspect was presented "singly, in handcuffs, and surrounded by police officers"). *See also United States v. Kessler*, 692 F.2d 584, 586 (9th Cir. 1982) (concluding that even when "a large number of officers" is present, "[t]he use of handcuffs or other indicia of custody will not invalidate a show-up, at least where necessary for the prompt

8

and orderly presentation of the suspect, consistent with protection of the officers and witnesses"); *United States v. Moulton*, No. 10-CR-00120, 2010 WL 6084115, at *10 (N.D. Ga. Nov. 22, 2010) (citing additional cases), *report and recommendation adopted*, No. 1:10-CR-120-MHS, 2011 WL 902639 (N.D. Ga. Mar. 14, 2011).

Second, the Motion does not provide facts showing that the police aggravated the alleged suggestibility of the show up. In approximately two hours, law enforcement officers acted promptly to bring T.C.M. to the interstate where Defendant was recently stopped after allegedly fleeing the scene. When they got there, they gave T.C.M. careful warnings that he should not feel pressured to make a positive identification; that the individual may or may not be the person he saw fleeing; and that the investigation would continue regardless [ECF No. 135 p. 10; ECF No. 135-2 p. 3]. These actions did not unconstitutionally enhance the suggestiveness of the show up. *See Johnson*, 817 F.2d at 729. Further, while Defendant cites the particular circumstances of this case as purported evidence of undue suggestiveness—i.e., high number of officers on scene, blocked highway location, handcuffs on Defendant, and a helicopter transport of a civilian witness to facilitate a confrontation 40 miles away—the Motion does not offer any legal authority suggesting that any of those circumstances, whether individually or in combination, warrant reaching a different conclusion here on suggestiveness than reached by the various courts cited above that have rejected efforts to suppress identifications. As the Eleventh Circuit has stated, immediate show ups permit identifications "before the suspect has altered his appearance and while the witness' memory is fresh." *Johnson*, 817 F.2d at 729. Defendant does not provide a basis to conclude that the police exacerbated the alleged suggestiveness of the confrontation.

**C. Even if the show up was unduly suggestive, T.C.M.'s identification was reliable.**

The Court need not proceed to step two of the constitutional identification inquiry because the show-up was not unduly suggestive. *See Smith*, 967 F.3d at 1203–04. For completeness, however, even if Defendant had shown that the show up was unduly suggestive, the totality of the circumstances establishes that the identification was reliable. "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Brathwaite*, 432 U.S. at 114. The factors relevant to that determination are as follows: (1) "opportunity of the witness to view the criminal at the time of the crime"; (2) degree of attention; (3) accuracy of the description; (4) "level of certainty demonstrated by the witness at the confrontation"; and (5) length of time between the crime and the identification. *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972); *see Diaz*, 248 F.3d at 1102. Under this "totality of the circumstances approach," the Court concludes that T.C.M.'s show-up identification was reliable. *See Perry v. New Hampshire*, 565 U.S. 228, 239–40 (2012) (directing fact-specific assessment).

Opportunity to view & degree of attention. T.C.M. had sufficient opportunity to view the fleeing Defendant, as reflected by his near contemporaneous documentation of distinguishable details as he observed Defendant and then followed his vehicle. T.C.M. took photos and a video of the male's vehicle and wrote down details of both the vehicle and the male, reflecting a significant degree of attention. *See United States v. Whitehead*, 567 F. App'x 758, 768 (11th Cir. 2014) ("[The witness] was attentive during the crime and recalled specific details concerning the robbery, including what [the defendant] was wearing, the type of gun he was carrying, and other details about his physical appearance.").

Accuracy of description & level of certainty. There are accurate and inaccurate portions of T.C.M.'s description of Defendant, but in the totality of the circumstances, the Court finds that the identification was significantly accurate. T.C.M.'s description was accurate because he

10

originally described the individual that he saw as a white male with blonde, unkept hair, who "looked right at [him]" [ECF No. 135-1 p. 3]. At the show up, T.C.M. observed Defendant, asked to see him from the side, and confirmed that he was "99.9" confident on a scale from 1 to 100 that Defendant was the individual that he had seen running from the golf course approximately two hours before [ECF No. 135-2 pp. 4–5]. In addition, T.C.M. also accurately identified the make, model, and color of the vehicle driven by Defendant—all specific and concrete details memorialized almost immediately. As to T.C.M.'s mistaken estimation of Defendant's age— "early- to mid-twenties," whereas Defendant is 58—that alone does not render the identification unreliable when viewed collectively. And while Defendant latches on to T.C.M.'s statement that the male tossed a black object through the vehicle's sunroof—despite the vehicle not having a formal sunroof—that relatively minor discrepancy does not outweigh the otherwise accurate details of T.C.M.'s identification, which he conveyed with almost 100% confidence.[5]

      Length of time between crime and identification. The two-hour window between the crime and the show-up weighs strongly in favor of a reliable identification under the *Biggers* test. *See United States v. Daniels*, 97 F.4th 800, 810–11 (11th Cir. 2024) (three days passing was "very little time" between crime and identification); *Brathwaite*, 432 U.S. at 115–16 ("We do not have here the passage of weeks or months between the crime and the viewing of the photograph."); *United States v. Caldwell*, 963 F.3d 1067, 1076 (11th Cir. 2020) (show-up occurring just over 30 minutes after robbery reliable). Defendant even admits that "the show-up occurred relatively soon after the incident" [ECF No. 141 p. 6].

---

[5] The United States notes that the vehicle did have a latched storage compartment on the roof, which the witness may have mistaken for a "sunroof" [ECF No. 135 pp. 12–13].

11

\*\*\*

Suppression is not warranted here. Defendant "can both cross-examine [T.C.M.] and argue in summation as to factors causing doubts as to the accuracy of the identification including reference to . . . any suggestibility in the identification procedure . . . ." *Brathwaite*, 432 U.S. at 113 n.14 (internal citation omitted); *see also Simmons*, 390 U.S. at 384 (stressing role of cross-examination to test reliability of identifications). The Motion does not provide a basis to deviate from the "time-honored process of cross-examination as the device best suited to determine the trustworthiness" of T.C.M.'s testimony. *Watkins*, 449 U.S. at 349.[6]

## CONCLUSION

For the reasons stated above, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion [ECF No. 117] is **DENIED**.

**ORDERED** in Chambers at Fort Pierce, Florida, this 24th day of May 2025.

AILEEN M. CANNON
UNITED STATES DISTRICT JUDGE

cc: counsel of record

---

[6] In light of the Court's conclusions that the show up was not unduly suggestive and that T.C.M.'s identification was reliable, Defendant's request to suppress all in-court identifications—based on an impermissible tainting theory—is denied [ECF No. 117 pp. 10–11]. Nothing in this Order precludes Defendant from introducing relevant evidence on the identifications or from engaging in fulsome cross-examination of T.C.M. or any other witness with knowledge about the identifications or their surrounding circumstances.