UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-80116-CR-CANNON/McCabe

UNITED STATES OF AMERICA

vs.

RYAN WESLEY ROUTH,

    Defendant.
_____/

### GOVERNMENT'S MOTION TO EXCLUDE PROPOSED DEFENSE EXPERT MICHAEL McCLAY

Pursuant to this Court's April 15 Order (ECF No. 128:4), the United States moves to exclude the testimony of proposed defense expert Michael McClay. The Defendant's initial disclosure for McClay did not comply with the Rules, failing to identify actual opinions as opposed to just describing subject matters. The one opinion it arguably did identify is unhelpful and has no fit with the allegations here, violating FRE 401, 402, 403, and 702 and *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) (*en banc*). Routh's more recent disclosure in the wake of McClay's "test-fire" of the rifle (preview: it fired, twice) makes a motion imperative. McClay's latest proposed opinion is unhelpful, speculative, and irrelevant except to an impossibility defense that the Court now has rejected. Given the totality of these issues, McClay should be precluded entirely from testifying. As Judge Marcus wrote in *Frazier*, criminal defendants are not entitled to call an expert simply because the Government is calling one, and do not have a "right to present expert testimony free from the legitimate demands of the adversarial system." *Id.* at 1272 (quotation marks and citation omitted).

1

## BACKGROUND

### Facts and Charges

This case arises out of the Defendant's calculated plan to assassinate now-President, then Major Presidential Candidate, Donald J. Trump (hereafter, "President Trump" or "the President") before he could be re-elected. The Defendant illegally purchased a military-grade SKS rifle, traveled from North Carolina to the West Palm Beach area, and then on September 15, 2024, in anticipation of the President playing golf there, concealed himself near the 6th green of the Trump International Golf Club. Routh loaded the weapon's magazine with 20 rounds of ammunition, drew one into the rifle's chamber, and positioned it to fire. Only the arrival of a Secret Service agent thwarted Routh's plan, prompting his flight.

The indictment alleges five crimes. Count 1 charges Routh with the attempted assassination of a Major Presidential Candidate, contrary to 18 U.S.C. §351(c). It will be our burden to show that Routh intended to kill President Trump and took one "substantial step" toward doing so. S*ee, e.g., United States v. McDowell*, 250 F.3d 1354, 1365 (11th Cir. 2001). Count 2 charges Routh with knowingly possessing and brandishing a firearm in furtherance of that assassination attempt, contrary to 18 U.S.C. §924(c)(1)(A)(ii). Count 3 charges that Routh intentionally assaulted a federal officer (the Secret Service agent), in violation of 18 U.S.C. §§111(a)(1) and (b). Count 4 alleges that Routh, a convicted felon, knowingly and unlawfully possessed a firearm, contrary to 18 U.S.C. §922(g)(1). Count 5 alleges that Routh knowingly possessed a firearm with an obliterated serial number, contrary to 18 U.S.C. §922(k).

### Routh and McClay

In its December 23, 2024 Order, this Court ordered the defense to make its expert disclosures no later than March 29, 2025 (ECF No. 91:6). This deadline was six months after

Indictment and four months after the Government had made its initial expert disclosures. On March 29, the Defendant proposed McClay, an American Airlines pilot, as a proposed expert witness. McClay has past experience in the military and law enforcement. The defense has hired McClay to testify about matters relating to Routh's hide and the rifle, presumably to support a defense claim that Routh lacked the intent to kill President Trump.

McClay's initial disclosure was the following:

> Mr. McClay would testify from his weapons and tactical expertise and training regarding the alleged assailant's activities and positioning. He would testify regarding the observation point, including its vantage point, obstructed and non-obstructed views, positioning of potential target, impact of target movement, concealment, coverage provided from the plates in the tote bag and backpack, selection, reconnaissance, measurement, line of sight angles, obstructions, potential deflection, terrain, selection, measurement, sustainment, positioning of vehicle, ability to retreat, ability to fire this type of semi-automatic rifle, body positioning, and factors that could affect a shot. Regarding the capacity of the weapons system seized from the crime scene, Mr. McClay would testify of the rifle's operation with this scope, including proper setting of a scope, proper materials for scope mounting, ability for scope mounting and removal, impact of scope mounting and removal on rifle, scope adjustment, magnification levels and their function for enlargement at distance and surrounding field of vision, necessity and hindrance of scope use, use of paper attachments to the scope optics, quality of materials attached to the rifle, potential impact of firing to scope, purpose and ability of use of iron sights, quality of ammunition stored, caliber, firing capacity, standard deviation, potential mechanical impacts of a rifle's ability to fire. The rifle, in its state at the scene of the alleged offense, would not have been the optimal precision sniper tool. A sniper would choose a precise, accurate weapon and not utilize the additions to the rifle of the silicone/putty, wrapper optic shroud, hose clamps, and the scope itself without a proper mounting bracket. These variables risk the scope to be "out of zero."

Letter to AUSA from Defense Counsel, March 29, 2025 (Noticed at ECF No. 113).

Meanwhile, the defense sought to test-fire the rifle. As the Court will recall, the defense requested a test-fire because it wanted to assess whether the weapon could have operated – a fact the FBI had confirmed shortly after the assassination attempt, eight months earlier. The Government opposed that request, in part because it related only to an impermissible defense of

impossibility. The Government also argued that the defense waited until four months after Indictment to even raise the idea of such a test. The Court ultimately agreed that "[o]perability of the subject rifle is not an essential element of any of the offenses charged in the Indictment" and that factual impossibility is a "legally improper theory," but ruled that "[b]ecause the United States seeks to present evidence and argument at trial that the seized rifle in this case was operational when barrel tested in the laboratory days after its seizure in September 2024, … good cause exists to authorize a confidential defense live fire test of the rifle limited to an examination of its actual or potential operability." (ECF128::2). The Court stressed, however, that its Order did "not determine any other issue or motion in this case." (*id.*:3).

The Court directed the defense to make any supplemental expert disclosure about the test-fire no later than Friday, May 30. On May 30 at 8 p.m., the defense provided this supplemental disclosure. In it, the defense states that McClay conducted a test-fire exercise on May 13, 2025. The disclosure acknowledges that, contrary to earlier defense speculation, the rifle indeed fired – twice. It goes on, however, to claim that the weapon also "misfired." Specifically:

> Mr. McClay would testify that on May 13, 2025, he conducted an operability test of the Norinco semi-automatic rifle, Model SKS … [T]he ammunition [was] Federal American Eagle 7.62 x 39mm, 124 grain centerfire rifle cartridges. McClay took possession of the firearm and magazine. … [T]wo of those 7.62 x 39mm cartridges were filled into the magazine. McClay loaded the magazine into the rifle, placed the weapon onto fire (position), and pulled the trigger. The rifle expelled the projectile into the berm and the bolt extracted the spent casing.
>
> As the bolt went forward to cycle the second round from the magazine, the cartridge misfed and jammed at the throat of the chamber. McClay verbally announced a misfeed, rendered the rifle safe, and confirmed the misfeed with the FBI Agent. McClay then removed the magazine and the misfired cartridge from the rifle. … McClay retrieved two new rounds to repeat the process. The same action occurred with the firing of the first cartridge and the same type of misfeed on the second cartridge. … Both cartridges that failed to feed into the rifle chamber appeared to have the bullets compressed further into their casings when compared

>   to the remaining ammunition. …
>
>   Mr. McClay would testify to his opinion that this firearm with the configuration of two cartridges loaded in this magazine would be operational for the first round. A second cartridge would likely continue to fail to feed into the chamber and therefore not be able to be fired. The failure to feed is likely to due to the magazine's ineffectiveness to properly feed the second cartridge into the chamber to complete the rifle manufacturer's designed cycle of action. Adequate magazines require appropriate spring tension for the entire capacity of the magazine, through all cycles of the action. Each round should have equal pressure of the spring so that the firearm is able to adequately chamber a cartridge. Additional testing would be required to rule out any other variables associated with the magazine.

Letter to AUSA from Defense Counsel, May 30, 2025 (Noticed at ECF No. 165).

In other words: there is now no dispute from the defense that the weapon is operable, and is capable – even after the passage of eight months and FBI laboratory testing and storage and defense handling – of killing. Having test-fired the rifle himself when he bought it illegally, Routh knew this long ago. The defense nevertheless wants McClay to tell the jury that the rifle "would likely" not have gotten off *multiple* deadly rounds, without saying exactly why, beyond that it did not do so for him.[1] To the extent McClay will say that the problem lies in the magazine's "spring tension" (something he implies, but does not say outright), such an opinion displays obvious and very basic misunderstandings, including about the difference between the rifle as it exists today and as it existed on September 15. For present purposes, however, it is enough that McClay's proposed testimony, even if it were reasonable, has no relevance to this trial and does not rebut any proposed testimony from the Government.

---

1   The FBI's toolmark expert, Mr. Smith, encountered no such issue in firing two rounds from the rifle as part of his inspection at Quantico, an inspection that subsequently included treating the weapon to try to recover its obliterated serial number. We previously provided the Court a copy of Smith's report (ECF. No. 129-1).

## ARGUMENT

### General Legal Standards for Proposed Expert Testimony

A district court serves a critical role as the "gatekeeper" to the admission of expert testimony. *Frazier*, 387 F.3d at 1258 (citing *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993)). The gatekeeping obligation applies with equal force to all types of proposed expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). That obligation also applies fully to a criminal defendant's proposed expert testimony, however important to the defense that testimony supposedly may be. *See, e.g., United States v. Henderson*, 409 F.3d 1293, 1302-04 (11th Cir. 2005) (affirming exclusion of defendant's proposed expert testimony); *Frazier*, 387 F.3d at 1260, 1271-72 (same, emphasizing that a criminal defendant's constitutional and procedural rights do not entitle him to a lower standard for the presentation of expert opinion evidence); *United States v. Cunningham*, 194 F.3d 1186, 1196 (11th Cir. 1999) (same); *United States v. Gillard*, 133 F.3d 809, 814-16 (11th Cir. 1998) (same).

The *en banc* Eleventh Circuit opinion in *Frazier*, a criminal case, lays out the requirements for admitting expert testimony. The district court's gatekeeping function "inherently require[s] the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility." 387 F.3d at 1260.

To determine whether expert evidence is admissible, trial courts must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to

6

determine a fact in issue; and (4) the testimony passes the Fed. R. Evid. 403 balancing test, in that its probative value must not be substantially outweighed by its unfairly prejudicial effect. *See id.* at 1260, 1263. The proponent of the testimony, not the party challenging it, has the burden of establishing each of these requirements. *See id.*; *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1238 n.2 (11th Cir. 2005).[2]

In *Frazier*, the Eleventh Circuit used these principles to affirm the district court's exclusion of a defense expert. The defendant raised the same Due Process considerations commonly asserted as pushback to the idea of excluding a defense expert, but the Court of Appeals disagreed. Judge Marcus, writing for the *en banc* court, explained that "the trial judge's role as gatekeeper is designed to ensure that the jury, in carrying out its prescribed role, bases its determinations on relevant and reliable evidence, rather than on speculation or otherwise unreliable conjecture. These bedrock principles establish that, while a criminal defendant must be given every meaningful opportunity to present a complete defense, in doing so he must comply with the procedural and evidentiary rules designed to facilitate a search for the truth. … Frazier's right to put on a meaningful defense did not include the unfettered and unreviewable opportunity to present all expert opinion, even if it did not meet the basic requirements for admissibility." 387 F.3d at 1272.

---

[2] FRE 702 was revised in 2023 to state more expressly certain criteria for admitting expert testimony, but courts continue to apply the principles of *Frazier* and *Daubert*, which incorporate other requirements from the Rules of Evidence. *See, e.g., United States v. Rudolph*, 2024 WL 1703643 (M.D. Fla. April 24, 2024) (excluding proposed defense expert).

## Why McClay Should Be Excluded

Because the only actual opinions the defense has provided for McClay have no fit and would not help the jury, and no other opinions have been disclosed even in summary form, McClay should be excluded from testifying.[3]

### I. McClay's Account of His Test-Fire Should Be Excluded as Irrelevant and Unhelpful.

Routh's counsel argued for the test-fire ostensibly to support a potential defense on Count 1 that Routh believed the weapon would not fire and thus he never intended to kill the President. Such a potential defense flies in the face of all evidence, but McClay's exercise confirms that the weapon, even now, fires, so this claim is put to bed. But the defense persists in offering evidence about supposed defects in the rifle that might have affected Routh's ability to kill President Trump on September 15. Specifically, they want McClay to describe his alleged misfeed, and based upon it opine that "this firearm with the configuration of two cartridges loaded in this magazine would be operational for the first round [but] would likely continue to fail to feed into the chamber and therefore not be able to be fired." They actually want McClay to go further and blame the magazine, saying "the failure to feed is likely to due to the magazine's ineffectiveness to properly feed the second cartridge into the chamber to complete the rifle manufacturer's designed cycle of action."

The Court is now very familiar with the principle that a defendant cannot avoid guilt on an attempt charge by saying that, due to some fact or event outside his knowledge, he could not have completed the crime. "On many occasions, [the Eleventh Circuit] has affirmed attempt convictions

---

3   The Government may have other objections to McClay if he were allowed to testify, including about his qualifications, but our motion today does not rely upon those, in part because the lack of stated opinions makes fully assessing his qualifications impossible.

8

when the defendant could not have achieved the final required act because it would have been impossible to commit the actual crime." *United States v. Root*, 296 F.3d 1222, 1230 (11th Cir. 2002); *see also United States v. Duran*, 96 F.3d 1495, 1507 (D.C. Cir. 1996) (no impossibility defense to attempted Presidential assassination). This Court has ruled already that impossibility is a "legally improper" theory (ECF No. 128:2), and has announced that it will formally preclude evidence or argument relevant only to the supposed impossibility of completing this attempted murder. (*See* Tr. 5/14/25:52).

Given the law, what possible relevance could McClay's testimony about his test-fire have other than to suggest improperly that Routh might not have been able to succeed in killing President Trump if he had required a second shot to do so? We have now moved past the idea that the gun would not have fired at all – so we are well and truly beyond any good faith connection between the rifle's operability and Routh's intent. Testimony casting doubt on the ability of the rifle to fire multiple rounds has no relevance legally to our charges, which of course do not require any degree of firearm operability at all, or the firing of a gun. It is quite frankly hard to conceive how this testimony could aid Routh in any way. Of course, McClay does not propose to say, because he cannot, what the rifle actually would have done on September 15. The most he proposes to opine is that the rifle "would likely" not have gotten off multiple rounds based upon his experience eight months later. But even that limited opinion has relevance only to an improper impossibility defense.

McClay's proposed testimony also would not help the jury decide any material issue or fit the facts of this case. There is no allegation that Routh fired multiple rounds. There is no dispute, nor could there be, that a single bullet fired from this rifle could have killed the President or the

9

Secret Service agent if it struck its target. There is also no dispute that McClay cannot testify one way or another about Routh's intent to kill. *See also* FRE 704. So how would McClay's opinion aid the jury in reaching a lawful verdict?

The third prong of the *Daubert* analysis – whether the proposed testimony will help the jury – asks: will the expert's opinion truly aid the jury in resolving the issues genuinely before it? This inquiry is commonly called the "helpfulness" inquiry. *See Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) (citing *Frazier*, 387 F.3d at 1260). This is not a concern unique to expert testimony, however. Expert testimony, like all evidence, must be relevant. *See* FRE 401, 402. Unlike ordinary testimony, however, expert testimony must do more; it must go further and also "help the trier of fact to understand the evidence or to determine a fact in issue." FRE 702(a). As the Eleventh Circuit has explained, "more stringent standards of reliability and relevance . . . are necessary because of the potential impact on the jury of expert testimony." *Allison v. McGhan Med. Co.*, 184 F.3d 1300, 1309 (11th Cir. 1999). Courts therefore must "ensure that the proposed expert testimony is relevant to the task at hand [and] that it logically advances a material aspect of the proposing party's case." *Id.* at 1311 (internal quotation marks omitted) (citing *Daubert*). Expert testimony must also be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. The consideration has been aptly described ... as one of 'fit.'" *Daubert*, 509 U.S. at 591. McClay's proposed testimony about his test-fire exercise is not helpful to the jury in deciding any element of the charged crimes, and has no relevant fit with the Government's allegations.

Beyond unhelpfulness and lack of fit, McClay's implicit suggestion that the "failure to feed" was "likely" due to an ineffective magazine is pure speculation, making his testimony even

10

less helpful to the jury. Indeed, he half-concedes this in his disclosure, admitting that "[a]dditional testing would be required to rule out any other variables associated with the magazine." It should be patent why the rifle, eight months after its possession by Routh and having been subject to extensive laboratory testing and analysis plus extended storage, might not function in a test-fire exercise exactly as it had for the FBI's analyst Mr. Smith. McClay's disclosure takes no account of that reality. His test was not (because it could not be) an apples-to-apples comparison of operability with Smith's, and speculation about why the rifle may have misfed, or supposed flaws in the magazine as it exists today, is unhelpful. Defense counsel will have the opportunity to cross-examine Mr. Smith about the magazine, within the scope of Smith's direct and subject to the Court's rulings on impossibility and the Rules of Evidence. But expert testimony is subject to a higher bar, and cannot be so speculative.

Allowing McClay to testify about his test-fire would violate FRE 403 too. That rule allows a court to exclude evidence where its probative value is substantially outweighed by the risk that the evidence will confuse or mislead the jury or delay the trial by injecting collateral disputes. The rule governs all evidence, but applies with greater force to proposed expert testimony because of weight jurors may be inclined to give testimony offered in the capacity of an expert. *See Allison*, 184 F.3d at 1309; *see also Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 … exercises more control over experts than over lay witnesses." (citation and internal quotation marks omitted)). Even if it had some marginal relevance, McClay's proposed testimony would confuse the jury about the availability of impossibility as a defense, the differences between the rifle today and when Routh

11

possessed it, and the total immateriality of McClay's exercise to Routh's intent – the ostensible reason for the test. That the defense apparently wants to introduce the supposed "misfed" rounds as evidence during McClay's testimony (ECF No. 166) only worsens the Rule 403 problem by setting up a confusing mini-trial about those items, a particular waste of time since there is no allegation that Routh got off a single round himself. Routh cannot meet his burden of showing that McClay's proposed testimony about the test-fire passes muster under binding precedent or the Rules of Evidence.

> II. **McClay's Opinion about Whether Routh's Rifle Was the "Optimal Precision Sniper Tool" and Suggestion that a "Sniper Would Choose" Some Different, Unspecified Weapon Is Irrelevant, Unhelpful and Confusing.**

In his initial disclosure, McClay offered, at best, one opinion: a statement that this rifle "in its state at the scene of the alleged offense, would not have been the optimal precision sniper tool" and that "[a] sniper would choose a precise, accurate weapon and not utilize the additions to the rifle of the silicone/putty, wrapper optic shroud, hose clamps, and the scope itself without a proper mounting bracket." This proposed opinion lacks any fit to the facts of the case and would not be helpful to the jury.

The Government is not alleging that Routh was a professional sniper; in fact, presidential assassination via professional sniper is largely the stuff of fiction and fantasy. *Cf.* Frederick Forsyth, *The Day of the Jackal* (1971) (President of France's aspiring killers hire professional assassin for the job, famously insisting "We are not terrorists, you understand. We are patriots."). If the Defendant intended to kill President Trump, and took a substantial step toward doing so, he violated §351 – whether or not he was a trained sniper, whether his weapon of choice was the "optimal precision tool" for some hypothetical trained sniper, or whether a trained sniper "would

12

choose" a more "precise, accurate weapon."[4]  Magistrate Judge McCabe captured the irrelevance of this kind of claim when he queried defense counsel skeptically at the detention hearing: "But why is that relevant?  In other words, the point you may be making is that to the extent he was trying to be an assassin, he was not a very good one?" (Tr. 9/24/24:69).

The Government, for its part, is not offering testimony that the rifle was the "optimal precision sniper tool," so an opinion on that topic isn't rebuttal.  We will elicit testimony that Routh took steps and followed protocols (such as setting up a hide) consistent with a sniper's attack, but those steps are relevant to his intent to kill no matter what label is affixed to them, and we will not be eliciting testimony about the "optimal tool" Routh should have used to murder his victims.  And just because the government offers expert testimony about a subject generally (such as the capabilities of this type of rifle, as allowed by this Court, ECF No. 128:2), that doesn't mean defense gets carte blanche to go further.  *Compare, e.g., Frazier; United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005); *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (affirming exclusion of defendant's proposed expert as unqualified, despite argument that expert's testimony was essential to rebut prior testimony by a government expert on the same topic).  At best an opinion about how "optimal" this rifle was in Routh's hands goes to an invalid defense of impossibility that the Court has precluded.

In summary, McClay should not be allowed to voice any opinion going to whether this rifle, at the time Routh possessed it, was the "optimal precision sniper tool," or to what weapon in McClay's view might have been more "optimal."  Allowing McClay to do so would violate

---

4    Of course, we know that Routh had extensive experience with firearms, and that according to the defense's own words, that experience bears directly on his intent to kill.  *See* ECF. No. 122 (Government's 404(b) motion).

13

*Daubert*, this Court's impossibility rulings, and risk the jury confusion and distortion that FRE 403 precludes. After all, when it comes to guns, felons can't be choosers; Routh, a convicted felon unable to buy a gun legally, surely did not have the luxury of selecting whatever unspecified "optimal" "precision" "tool" McClay has in mind.

### III. The Remainder of McClay's Disclosures Do Not Comply with the Rules, State No Actual Opinions, and Do Not Provide a Basis for Him to Testify.

McClay's initial disclosure lacked any other statement of his proposed opinions or the bases for those opinions. Instead, it described subject matters – which are not opinions. The Rules require, even at this stage, at minimum a summary of actual opinions.

McClay's initial disclosure does not comply with Rule 16 or Local Rule 88.10(o)(3). Federal Rule of Criminal Procedure 16(b)(1)(C)(iii) requires that a defendant provide a "complete statement of all the opinions that the defendant will elicit from the witness in the defendant's case-in-chief," as well as "the bases and reasons for them." Local Rule 88.10(o)(3) sets a timetable for this complete disclosure, allowing it to be made closer to trial, but the defendant must first provide "a synopsis of: the anticipated opinions [and] the bases and reasons for those opinions." This is the bare minimum we believe the Court expected when, in its December 23, 2024 Order, it directed the defense to provide its expert disclosures by March 28, and wrote expressly that this deadline was "well beyond" what the Rules required. (ECF91:6).

Other than critiquing Routh's rifle as not the "optimal precision sniper tool," McClay's disclosure provides no synopsis of opinions, just a description of subject matters. The absence of opinions makes it impossible for the Government to assess whether any of his potential opinions (other than those addressed above) are actually admissible. We cannot evaluate whether he is qualified to offer these unstated opinions, whether they would fit the allegations in the case, or

14

whether they survive the other hurdles for expert testimony under the Rules. This uncertainty is compounded by the fact that the defense apparently now wants to offer McClay as an omnibus expert in firearms as well as sniper tactics.

Case law is clear that a court may exclude a proposed expert where the disclosures for that witness do not comply with the Rules. *See, e.g., United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) ("The Rule requires a summary of the expected testimony, not a list of topics."); *United States v. Valentin*, 2016 WL 1211304, at *3 (D. Conn. Mar. 25, 2016) ("[m]erely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions"); *United States v. Mahaffy*, 2007 WL 1213738, at *3 (E.D.N.Y. Apr. 24, 2007) (same); *see also United States v. Barile*, 286 F.3d 749, 758–59 (4th Cir. 2002) ( "Upon finding a violation of Rule 16, the district court has discretion under the Federal Rules of Criminal Procedure to determine the proper remedy.... Rule 16(d)(2) specifically allows the district court to prohibit the party [who does not comply with the discovery rules] from introducing evidence not disclosed." (quotation omitted) (alteration in original)). Although Rule 16's expert disclosure requirements were modified in 2022, nothing about those amendments changed the requirement that a defendant disclose actual proposed opinions in advance of trial. Just the opposite – the amendments were "intended to facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed." Rule 16 Adv. Comm. Notes, 2022 Amendments. In short, merely identifying the general topics about which an expert will testify is insufficient; rather, a Defendant must reveal the expert's actual opinions. That has not happened for McClay, even in the form of a synopsis.

Taking just one example, the defense says that McClay "would testify from his weapons

and tactical expertise and training regarding the alleged assailant's activities and positioning." But he does not tell us what he proposes to say "regarding" Routh's "activities and positioning." Was he well-positioned? Poorly positioned? Judging by who? And most striking: To do <u>what</u>?

In refusing to provide even a synopsis of opinions on these subjects, the defense also fails to provide the bases and reasons for opinions. That's another serious omission, because we have no way to assess how McClay's "weapons and tactical expertise and training" gives him a *Daubert*-satisfactory basis to opine about Routh's positioning as it might relate to the charges in this case.

We recognize that exclusion is not the only or necessarily preferred remedy for a Court reviewing inadequate expert disclosures. In this case, it is proper. As things stand now, the defense has not proposed a single legally-permissible opinion from McClay, and there is no reason to believe it could do so if given another extension. There is also no good cause for an extension. Routh had six months after the Indictment, and up to four months after we disclosed experts on the topics about which McClay proposes to testify, to make the required disclosures. *See* ECF No. 103. In setting its March 29 deadline, the Court stated pointedly: "This deadline, and related deadlines set forth in this Order, *go well beyond the date by which Defendant's reciprocal obligations were triggered in this case* but are crafted as such to ensure ample time for defense discovery review and expert evaluation." (ECF91:6) (emphasis added). The defense then had two extra months after March 29 to ponder its disclosures for McClay, knowing that McClay would be their chosen "hired gun" for the test-fire, and that additional disclosures in his name would be forthcoming. Yet they added nothing.

Allowing further disclosures at this stage, with discovery closed as of June 6th and trial

16

imminent, would at minimum restart the cycle of pre-trial litigation about experts at a time when the Court and the parties should be focusing on exhibit and jury issues. It would also be unfair to the Government, requiring us to pivot our trial preparation to address previously-undisclosed expert opinions, and either obtain further experts or make additional Rule 16 disclosures of our own. The defense remains free to fulsomely cross-examination the Government's experts, in exactly the way the Court expressly contemplated in its April 15 Order (ECF No. 128:2). On this record, that suffices.

## **CONCLUSION**

For all of the foregoing reasons, the Court should exclude McClay from testifying at trial.

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

By:  /s/ *John Shipley*
John C. Shipley
Florida Bar No. 69670
Christopher B. Browne
Florida Bar No. 91337
Maria K. Medetis-Long
Florida Bar No. 1012329
Assistant United States Attorneys

U.S. Attorney's Office
Southern District of Florida
99 Northeast 4th Street, 8th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9111
E-mail: John.Shipley@usdoj.gov

        SUE BAI
        SUPERVISORY OFFICIAL PERFORMING THE
        DUTIES OF THE ASSISTANT ATTORNEY
        GENERAL FOR THE NATIONAL SECURITY
        DIVISION

By:    */s/ James Donnelly*
       James Donnelly, Trial Attorney
       Court ID No. A5503278
       Department of Justice, National Security Division
       950 Pennsylvania Avenue, NW
       Washington, DC 20530
       Telephone: (202) 514-0849

## **CERTIFICATE OF SERVICE AND CONFERRAL**

The Government filed the foregoing document with the Clerk of the Court using CM/ECF on June 9, 2025. The Court's April 15 Order (ECF No. 128) directed the Government to file its position on McClay by today by motion, which we are doing; we nonetheless asked defense counsel today by email to let us know if they no longer intend to call McClay. As far as we know, they still seek to call him.

        */s/ John C. Shipley*
        Assistant United States Attorney