UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 24-80116-CR-CANNON/McCabe

UNITED STATES OF AMERICA

vs.

RYAN WESLEY ROUTH,

    Defendant.
_____/

### GOVERNMENT'S RESPONSE TO DEFENDANT'S
### OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

After hearing eight days of evidence and deliberating less than three hours, a jury found the Defendant guilty of attempting to kill President Donald J. Trump with an illegally possessed firearm and intentionally assaulting a federal agent in the process. Although the Defendant does not dispute that his advisory Guidelines range, however calculated, is life imprisonment, he objects to (1) the entire "Offense Conduct" section of the Presentence Investigation Report ("PSI"), and (2) his placement in criminal history Category VI based on the U.S.S.G. § 3A1.4 "terrorism" sentencing enhancement that unquestionably applies to his offenses.

The Court should adopt the PSI's Offense Conduct and reject the Defendant's wholly unsupported attempt to re-litigate the evidence considered by the jury when it convicted the Defendant of all charges. *See United States v. Costales*, 5 F.3d 480, 488 (11th Cir. 1993) ("[A] district court cannot use the post-trial sentencing process to call the jury's verdict into question."). And while it is academic given that the Defendant does not object to the Guidelines recommended sentence of life imprisonment, the Court should also reject his specious objection to the effect of U.S.S.G. § 3A1.4 on his criminal history category. The PSI faithfully recounts the admitted trial

evidence, and correctly calculates his criminal history category as VI and his advisory Guidelines sentence as life imprisonment, which is exactly what his conduct deserves.

## INTRODUCTION

The Defendant's offenses of conviction all relate to his attempt to kill President Trump, then a major Presidential candidate, culminating on September 15, 2024, when the Defendant camped out in a sniper hide he had carefully constructed near where President Trump was playing golf, armed with an illegally possessed SKS rifle whose serial number he obliterated. When the Defendant was discovered by Secret Service Special Agent Robert Fercano, who was shortly ahead of President Trump on the golf course, the Defendant moved the rifle in Special Agent Fercano's direction before fleeing the scene. The Government's evidence also proved that in the months leading up to that day, the Defendant took numerous other steps to plot President Trump's assassination and to acquire the illegal firearm that he would use to try to carry it out. The PSI accurately recounts this relevant conduct for his offenses based upon the admitted trial evidence that led to the Defendant's guilty verdict [PSI ¶¶4-44].

The Defendant's Guidelines recommendation is driven by his conviction for his attempt to assassinate President Trump under 18 U.S.C. § 351(c) in Count 1 of the Indictment, since that offense does not group with any other offense and results in an offense level nine levels or more higher than any other offense group [PSI ¶¶72-75, citing U.S.S.G. § 3D1.4]. The Defendant's properly-calculated offense level for Count 1 is the result of a base offense level of 33 (U.S.S.G. § 2A2.1) with an additional six offense levels based on the "official victim" adjustment (U.S.S.G. § 3A1.2(b)). In addition, since the Defendant's conviction in Count 1 involved a "federal crime of terrorism," the PSI found he qualified for the "terrorism" enhancement in U.S.S.G. § 3A1.4 [PSI ¶62], which requires an offense level increase of 12, resulting in a total adjusted offense level of

51. Pursuant to Chapter 5, Part A of the Guidelines, since this calculated adjusted offense level is greater than 43, the Defendant's total offense level is treated as 43, as reflected in the PSI [PSI ¶78].

The Defendant does not object to this calculation or to the PSI's finding of an offense level of 43. (*See* Defendant's Obj. [ECF No. 380] at 1).

The Defendant does, however, object to his placement in criminal history Category VI. Despite his staggering number of state criminal convictions dating back to 1983, [PSI ¶¶80–136], including a felony conviction for possession of a weapon of mass destruction in 2002, [PSI ¶109], the PSI awarded no criminal history points for these convictions pursuant to U.S.S.G. § 4A1.2 [PSI ¶117]. Nonetheless, since his conviction on Count 1 unquestionably qualifies him for the U.S.S.G. § 3A1.4 "terrorism" enhancement, the PSI correctly placed the Defendant in criminal history Category VI rather than I [PSI ¶118]. *See* U.S.S.G. § 3A1.4(b); *see also id.*, cmt. n.3 ("Under subsection [3A1.4](b), if the defendant's criminal history category as determined under Chapter Four … is less than Category VI, it shall be increased to Category VI.").

Based on the Defendant's calculated total offense level of 43 and criminal history Category VI, the Defendant's Guidelines imprisonment range is life. In fact, the Defendant's Guidelines range would be life even if he were placed in criminal history Category I, as he acknowledges. (Defendant's Obj. at 4).

In sum, the Probation Office has (1) accurately summarized the Defendant's relevant conduct, as proven through evidence admitted at trial, and (2) correctly set his criminal history category and calculated his Guidelines range. The Defendant's arguments to the contrary fail.

# THE DEFENDANT'S OBJECTIONS

## Objection Regarding Offense Conduct

The Defendant's cursory objection to the PSI's entire Offense Conduct section should be overruled. (Defendant's Obj. at 1) ("By virtue of the Defendant's entry of a not guilty plea in this case defendant has denied the facts set forth in the offense conduct portion of the [PSI]," indicating that the Defendant "disputes and objects to the facts stated in the [PSI] offense conduct section, paragraphs 4-41" and "denies he acted with the intent to kill a presidential candidate alleged in paragraphs 42-44."). Notwithstanding the Defendant's wholesale denial of the facts, the PSI reflects admitted trial evidence relied upon by the jury to find him guilty. The Defendant has not (and could not have) made a cogent objection to any of it.

   I.   *The PSI Offense Conduct Accurately Reflects Admitted Trial Evidence Considered by the Jury Before Rendering Its Guilty Verdict.*

Sentencing is not the time to re-litigate facts already proved at trial. *Costales*, 5 F.3d at 488; *United States v. Adams*, 74 F.3d 1093, 1103 (11th Cir. 1996) ("the district court does not have the authority to grant a departure that completely nullifies the effect of the jury finding [of guilt]"). And at sentencing after a contested trial, "[t]he district court may base factual findings on evidence presented at trial, undisputed statements in the presentence report…, or evidence presented at the sentencing hearing, and it may make reasonable inferences from the evidence." *United States v. Green*, 981 F.3d 945, 953 (11th Cir. 2020). At this stage, the Defendant has no right to confront witnesses or victims. *United States v. Cantellano*, 430 F.3d 1142, 1146 (11th Cir. 2005) (the right to confrontation is a trial right, not a sentencing right). And hearsay is admissible as long as there are "sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence." *United States v. Zlatogur*, 271 F.3d 1025, 1031 (11th Cir. 2001) (quotation marks omitted). The Government need only prove a disputed fact

4

by a preponderance of the evidence. *United States v. Lawrence*, 47 F.3d 1559, 1567 (11th Cir. 1995). "Once the Government has presented proper evidence, the district court must either: (1) make an explicit factual finding as to the allegation; or (2) determine that no such finding is necessary because the matter controverted will not be taken into account in sentencing the defendant." *Id.* at 1567 (citing Fed. R. Crim. P. 32(c)(3)(D)).

Here, the Court should adopt the PSI Offense Conduct section in full given that it accurately reflects the evidence admitted and facts proven at trial. The PSI recounts the trial evidence concerning the Defendant's many steps, beginning in at least late March 2024 and stretching through September 15, 2024, to plan and carry out his intended assassination of President Trump. As reflected in the PSI, this trial evidence included cell phone location data and other evidence of the Defendant's travel to and from West Palm Beach (in the same vehicle that was found at the scene on September 15, 2024) in the months leading up to his arrest, as well as evidence that the Defendant stalked and surveilled the President at the Trump International Golf Club, Mar-a-Lago, Palm Beach International Airport, and other locations in August and September 2024 [*see, e.g.,* Trial Tr. 9/16/2025:165–278 (Special Agent Goodrich), 9/18/2025:135–179 (Detective Smith), 9/18/2025:217–264 & 9/19/2025:8–275 (Special Agent McGreevy); PSI ¶¶4, 9–18]. It also included the evidence of the Defendant's many online searches for information related to weapons and President Trump's campaign and travel schedule [*see, e.g.*, Trial Tr. 9/19/2025:64–77, 127–160 (Special Agent McGreevy); PSI ¶¶19, 24]. And the PSI incorporates the evidence of the numerous steps the Defendant took to conceal his criminal activities and to plan his escape [*see, e.g.*, Trial Tr. 9/18/2025:225–235 & 9/19/2025:166–203 (Special Agent McGreevy); PSI ¶¶25–30].

The PSI also describes the trial evidence related to Defendant's visit to a former employee's residence in North Carolina in April 2024, immediately following a trip to West Palm Beach, during which the Defendant left a box that contained components for an improvised destructive device, ammunition, burner cell phones, and a handwritten letter (the "Dear World" letter) that stated, "This was an assassination attempt on Donald Trump" [PSI ¶5]. This former employee and his brother testified at the Defendant's trial [Trial Tr. 9/16/2025:182–231 (Samuel and Lazaro Plata)], and the contents of the box the Defendant left, including the relevant portion of the letter, were admitted in evidence [Trial Tr. 9/16/2025:111–121 (Special Agent Perry), 9/16/2025:125–169 (Special Agent Foo)]. The PSI additionally includes the trial evidence concerning the Defendant's steps later in the spring and summer of 2024 to purchase a firearm, despite being a felon unable to lawfully possess one. As the PSI accurately sets forth, the Defendant purchased the SKS rifle later found on the crime scene from another former acquaintance in North Carolina, who testified at trial about the Defendant's purchase [Trial Tr. 9/16/2025:66–110 (Oxendine); PSI ¶¶6–8].

The trial evidence of the Defendant's activities on the day of September 15, 2024, when he came closest to killing the President, is also accurately described in the PSI. That evidence included cell phone location information and security camera footage confirming that the Defendant was on the scene [*see, e.g.*, Trial Tr. 9/16/2025:15–31 (Agent Patrick Lantry), 9/15/2025:8–107 (Special Agent Barrois)], as well the testimony of Special Agent Fercano, who noticed the Defendant obscured by the tree line near the 6th hole, approached him, and then saw the Defendant point a rifle in his direction [Trial Tr. 9/11/2025:48–111 (Special Agent Fercano)]. When Special Agent Fercano fired, the Defendant attempted to escape and was seen by a civilian witness, who testified at trial that he noticed the Defendant driving away, recorded his license plate, and

subsequently identified the Defendant at a traffic stop approximately 40 miles from the scene on I-95 [Trial Tr. 9/11/2025:114–152 (McGee); PSI ¶38]. The PSI also includes evidence regarding the FBI's investigation of the crime scene, including law enforcement's discovery of the Defendant's rifle by a fence on the tree line, along with two steel plates mounted in bags by the fence, intended to protect the Defendant from gun fire, and the Defendant's DNA and fingerprints on these items [*see, e.g.*, Trial Tr. 9/12/2025:55–74 (Lieutenant Gale), 9/12/2025:74–137 (Special Agent Rose), 9/15/2025:195–245 (Stewart), 9/15/2025:31–76 (Gregor), 9/16/2025:5–30 (Patterson); PSR ¶¶31–41].

Finally, the PSI Offense Conduct includes a section on the "Defendant's Intent" that is drawn from other trial evidence of the Defendant's hatred for President Trump and the Defendant's desire to ensure that the President could not be re-elected in 2024 by killing him [*see, e.g.*, Trial Tr. 9/16/2025:138–140 (Special Agent Llanes); PSR ¶¶42–44]. This evidence includes the Defendant's messages in July 2024, in which he asked for a rocket propelled grenade or stinger missile to kill President Trump, whom the Defendant said "cannot get elected" [Trial Tr. 9/19/2025:220–223 (Special Agent McGreevy); PSR ¶42(c)]. The Defendant's messages also indicate that his animus was partly related to his disagreement with actions taken during President Trump's first term, such as the withdrawal from the Joint Comprehensive Plan of Action ("JCPOA") agreement with Iran in 2018: "He needs to go away…he canceled the jcpoa for Iran…what a fucking idiot…I hate him" [Trial Tr. 9/19/2025:224 (Special Agent McGreevy); PSI ¶42(e)]. And the PSI also includes information about the Defendant's obscene song lyrics, which he wrote while in pretrial custody and further confirm his intent to kill President Trump [Trial Tr. 9/19/2025:227–230 (Special Agent McGreevy); PSI ¶44].

7

As noted above, all the Offense Conduct in the PSI to which the Defendant now objects, including the significant evidence of the Defendant's deadly intent, is based on admitted trial evidence that the jury considered and that the Court can and should accept as proven for purposes of sentencing.

> II. The Defendant Has Made No Specific or Clear Objections to Particular Facts in the PSI.

The Defendant's objections should further be overruled as a matter of law, which requires that PSI objections "be made with 'specificity and clarity' in order to alert the government and the district court to the mistake of which the defendant complains." *United States v. Ramirez-Flores*, 743 F.3d 816, 824 (11th Cir. 2014) (quoting *United States v. Aleman*, 832 F.2d 142, 145 (11th Cir. 1987)). "This requirement is not gratuitous; rather, it ensures that the government has an opportunity to address or correct the alleged error." *Id.* (citing *United States v. Gallo-Chamorro*, 48 F.3d 502, 507-08 (11th Cir. 1995)). But the Defendant's blanket objection to the PSI here—a wave-of-the-hand objection to any and all of the evidence considered by the jury at trial—is completely lacking in specificity or clarity.

Thus, even if the information in the PSI's Offense Conduct section had not already been admitted at trial, the Government has no way of responding to the Defendant's unspecified objection covering 41 paragraphs (PSI ¶¶ 4–44). And if the Defendant means to argue that certain facts he contests remain unproven despite the jury's verdict, he has not specified which facts. He simply disputes everything about what the Government presented and the jury found regarding his conduct. To take up such an objection would require a second trial, which the law does not require. *Costales*, 5 F.3d at 488. The Court should overrule the Defendant's all-encompassing objection to the Offense Conduct section, which accurately recounts the evidentiary proof relied on by the jury in reaching its swift verdict.

**The "Terrorism" Enhancement and the Defendant's Criminal History Category**

The Defendant's second objection to the PSI is also meritless. Although the Defendant does not object to the PSI's calculated offense level of 43, which includes the application of the U.S.S.G. § 3A1.4 "terrorism" adjustment, he argues that the PSI should not assign him criminal history Category VI pursuant to that same provision.

The Defendant's conviction under Count 1 is for a violation of 18 U.S.C. § 351, which is specifically enumerated under the statutory provision defining "federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5)(B), as incorporated in U.S.S.G. § 3A1.4. The Defendant appears to argue that since the parenthetical short-term description of section 351 as enumerated in section 2332b(g)(5)(B) does not include the words "assassination of a major Presidential candidate," it should not apply to his conviction here. (Defendant's Obj. at 3–4). This argument is puzzling but also baseless, and it is clear that *all* of the Defendant's convictions relating to his attempt to assassinate President Trump warrant the U.S.S.G. § 3A1.4 "terrorism" enhancement, including its requirement that the Defendant be sentenced in criminal history Category VI. *See* U.S.S.G. § 3A1.4.

   I.   *The PSI Properly Applied the "Terrorism" Enhancement.*

Although the Defendant does not appear to contest the application of at least the portion of U.S.S.G. § 3A1.4 relating to his offense level, there is no doubt that the enhancement applies in full. The U.S.S.G. § 3A1.4 terrorism adjustment applies whenever a defendant's offense "involved, or was intended to promote, a federal crime of terrorism," which is defined by statute in 18 U.S.C. § 2332b(g)(5). *See* U.S.S.G. § 3A1.4, cmt. n.1. A "federal crime of terrorism" is any offense that is (1) "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A); and (2) enumerated in 18

U.S.C. § 2332b(g)(5)(B). As the PSI recognized, the Defendant's violation of 18 U.S.C. § 351(c) in Count 1, based on the evidence the Government presented at trial regarding the Defendant's intent to kill President Trump in order to prevent his re-election and in retaliation for actions President Trump took during his first term, satisfies both prongs [PSI ¶62].

*First*, Defendant was convicted of violating Section 351(c) [PSI ¶1]. That statute is specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), even if it is accompanied there by a short-form parenthetical, "relating to congressional, cabinet, and Supreme Court assassination and kidnapping," that does not reference every possible form in which Section 351 can be violated (or every category of official victim). This short-form parenthetical in section 2332b(g)(5)(B) matches the statutory title of Section 351 itself, which does not include "major Presidential candidates" even though there is no doubt that killing or kidnapping major Presidential candidates, and attempting or conspiring to do so, is criminalized by that provision. *Compare* 18 U.S.C. § 351 statutory title, "Congressional, Cabinet, and Supreme Court assassination, kidnapping, and assault," *with* 18 U.S.C. § 351(a), "Whoever kills any individual who is…a major Presidential…candidate…shall be punished…," and 18 U.S.C. § 351(c) & (d), criminalizing attempts and conspiracies to do so. "Major Presidential candidate" is not "conspicuously absent" from section 2332b(g)(5)(B) as the Defendant suggests. (Defendant's Obj. at 4). Section 2332b(g)(5)(B) simply incorporates the short-form statutory title of Section 351, itself.

In any event, the short-form parenthetical describing Section 351 in Section 2332b(g)(5)(B) should obviously not be read to limit which violations under Section 351 may qualify as "federal crimes of terrorism." As the Supreme Court has recognized, a statutory title or heading is "but a short-hand reference to the general subject matter involved" and is "not meant to take the place of the detailed provision of the text" of the statute. *Bhd. of R. R. Trainmen v.*

*Baltimore & O. R. Co.*, 331 U.S. 519, 528 (1947); *see also Kanapuram v. Dir., US Citizenship & Immigr. Servs.*, 131 F.4th 1302, 1308 (11th Cir. 2025) ("Where statutory text and title are inconsistent, we go with the text.").

*Second*, in addition to the Defendant's conviction in Count 1 being an offense enumerated under Section 2332b(g)(5)(B),[1] the Government's evidence at trial established that this offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," as required under section 2332b(g)(5)(A). Indeed, it is hard to imagine offense conduct more calculated to influence, affect, and retaliate against the government than killing one of the two leading candidates for President, who had served as President just four years earlier.

Importantly, although there was ample evidence presented at trial of the Defendant's personal motivations to kill President Trump, the requisite "calculation" for section 2332b(g)(5)(A) relates to whether the government has shown the "defendant's offense was planned to influence, affect, or retaliate against government conduct, even if that was not the defendant's personal motive." *United States v. Arcila Ramirez*, 16 F.4th 844, 854 (11th Cir. 2021); *see also United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011) (U.S.S.G. § 3A1.4 "focuses on the intended outcome of the defendants' unlawful acts—i.e., what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was."); *United*

---

[1] While the PSI correctly focuses on the application of the U.S.S.G. § 3A1.4 enhancement to Count 1, the Defendant's offenses in Counts 2–5 "intended to promote" the attempted assassination in Count 1, so U.S.S.G. § 3A1.4 is applicable to those convictions as well. *See United States v. Mandhai*, 375 F.3d 1243, 1247–48 (11th Cir. 2004) (holding that even if an offense of conviction is not specifically enumerated under section 2332b(g)(5)(B), U.S.S.G. § 3A1.4 is applicable if that unenumerated offense "intended to promote" an enumerated offense, meaning that "a goal or purpose was to help bring into being a crime" that is enumerated).

11

*States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) ("calculation may often serve motive," but U.S.S.G. § 3A1.4's "calculation" requirement is satisfied if a defendant's offense was "planned—for whatever reason or motive—to achieve the stated object."). And any delusional claims by the Defendant about why his criminal conduct should somehow be justified are as irrelevant here as they were at trial, since U.S.S.G. § 3A1.4 is applicable regardless of a defendant's purported justifications. *See United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) (affirming application of U.S.S.G. § 3A1.4 for defendants who professed to try to "sav[e] our earth," because "the purpose behind defendants' actions was to further [their] political agenda: the end to industrial society").

The trial evidence of the Defendant's extensive planning and efforts to kill President Trump for at least six months, recounted accurately in the PSI, leaves no doubt that the Defendant's offense in Count 1 was "calculated" to prevent President Trump from serving another term, regardless of why the Defendant was so motivated [PSI ¶¶42, 44]. The jury's verdict reflects this and was necessarily based upon the factual finding that the Defendant intended to kill President Trump when he was a major Presidential candidate. *See* Jury Instructions [ECF No. 317 at 16] (describing the Defendant's specific intent as an element the Government must prove to convict on Count 1); *see also United States v. Dowell*, 430 F.3d 1100, 1110 (10th Cir. 2005) (holding that the jury made the factual finding that defendant's offense had the requisite "calculation" necessary for application of the U.S.S.G. § 3A1.4 enhancement when the jury convicted defendant of attempting to interfere with the IRS, having been instructed that an element of the offense was that defendant knowingly and intentionally "endeavored to obstruct or impede the due administration of the Internal Revenue laws by the use of force").

In addition to seeking to "influence or affect the conduct of government" by eliminating a major Presidential candidate, the evidence at trial also demonstrated that the Defendant intended to "retaliate against government conduct," specifically, against President Trump for the actions of the first Trump administration and for positions taken by then-candidate Trump during the 2024 Presidential campaign [*see, e.g.,* PSI ¶42(e) ("he canceled the jcpoa for Iran…what a fucking idiot…I hate him.")].[2]

While there is direct evidence of the Defendant's state of mind from the trial evidence of the messages he sent and other statements he made leading up to (and after) his arrest, his plotting and stalking of President Trump in the midst of the 2024 Presidential campaign allows a "natural inference" that is sufficient to satisfy the "calculation" requirement of U.S.S.G. § 3A1.4. *Arcila Ramirez*, 16 F.4th at 854 ("because a defendant often will not admit his full knowledge or intentions, the district court may find the requisite calculation or intent existed based on circumstantial evidence and reasonable inferences drawn from the facts"); *United States v. Wright*, 747 F.3d 399, 408–09 (6th Cir. 2014) (citing *United States v. Dye*, 538 F. App'x 654, 666 (6th Cir. 2013)); *see also Unted States v. Mohammed*, 693 F.3d 192, 202 (D.C. Cir. 2012) (the court may draw "plausible inferences" to find the requisite "calculation"). Indeed, the calculation required for U.S.S.G. § 3A1.4 "can be inferred from the defendant's choice of target," *United States v. Abu*

---

[2] In addition to the evidence admitted at trial, the record includes evidence of the Defendant's other statements demonstrating his intent to "retaliate" against President Trump for actions taken during President Trump's first term, such as the Defendant's 2023 self-published book, in which he wrote that he "must take part of the blame for the [person] that we elected for our next president that ended up being brainless….You are free to assassinate Trump…," as well as additional portions of the "Dear World" letter he left at Lazaro Plata's residence in April 2024, such as his claim that President Trump "ended relations with Iran like a child and now the Middle East has unraveled" [ECF No. 14 at 7, 9]. But the Court need not go beyond the admitted trial evidence for any purpose at sentencing, including for the application of the amply supported U.S.S.G. § 3A1.4 enhancement.

*Khatallah*, 314 F. Supp. 3d 179, 198 (D.D.C. 2018), here, President Trump, who was then a former President and a major Presidential candidate.

For all of these reasons, any contention that U.S.S.G. § 3A1.4 does not apply runs contrary to the jury's verdict, based on the evidence admitted at trial and the reasonable inferences to be drawn therefrom.

> II. *The Court Should Reject the Defendant's Objection to U.S.S.G. § 3A1.4(b)'s Placement of the Defendant in Criminal History Category VI.*

To the extent the Defendant means to argue that his automatic placement in criminal history Category VI pursuant to U.S.S.G. § 3A1.4(b) is somehow unwarranted or should be rejected by this Court, his is a faint echo of similar arguments that have been rejected by other courts and should be rejected here too.[3] As the Second Circuit has held, "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases."). This is true even though the Defendant was prevented from his achieving his goal of assassinating President Trump (*see* Defendant's Obj at 4, which

---

[3] The Defendant's argument regarding his placement in criminal history Category VI seems motivated by his concern about how such a finding "would likely impact on the Bureau of Prisons placement of Mr. Routh and limit [his] rehabilitation opportunities." (Defendant's Obj. at 4). But it is well established that a defendant's place of incarceration and programming is determined by the BOP, not the courts. *See United States v. Read*, No. 2:15-CR-6-FTM-38MRM, 2020 WL 3103983, at *1 (M.D. Fla. June 11, 2020), *citing* 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment[.]"); *Tapia v. United States*, 564 U.S. 319, 331 (2011) ("A sentencing court can recommend that the BOP place an offender in a particular facility or program...[b]ut decision making authority rests with the BOP.").

argues that "this was an unsuccessful attempt that caused no harm to the presidential candidate, his staff or to Secret Service agents"). As the Second Circuit has also explained:

> [T]he Guidelines, while only advisory appropriately reflect Congress's considered judgment that terrorism is different from other crimes. Terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal. Moreover, when it comes to sentencing terrorism, Congress and the United States Sentencing Commission plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences. Thus, in determining what constitutes a sufficient sentence for a terrorist defendant whose conduct did not result in death or physical injury, a sentence at the high end of the applicable range may plainly be reasonable if supported by the balance of § 3553(a) factors.

*United States v. Mumuni Saleh*, 946 F.3d 97, 112–13 (2d Cir. 2019) (internal quotations, citations, and alterations omitted). As explained in the government's Sentencing Memorandum [ECF No. 384], the Guidelines recommendation of life imprisonment after the application of the U.S.S.G. § 3A1.4 enhancement is compelled by the § 3553(a) factors in this case.

## **CONCLUSION**

For the foregoing reasons, the Court should find that the Defendant's PSI correctly describes the offense conduct and properly calculates the applicable Guidelines range, including with the application of U.S.S.G. § 3A1.4 to the Defendant's criminal history category. The Court should overrule the Defendant's objections.

Respectfully submitted,
JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:   /s/ *John Shipley*
John Charlton Shipley
Florida Bar No. 69670
Christopher B. Browne
Florida Bar No. 91337

        Maria K. Medetis Long
        Florida Bar No. 1012329
        Assistant United States Attorneys
        U.S. Attorney's Office
        Southern District of Florida
        99 Northeast 4th Street, 8th Floor
        Miami, Florida 33132-2111
        Telephone: (305) 961-9111
        E-mail: John.Shipley@usdoj.gov

        JOHN A. EISENBERG
        ASSISTANT ATTORNEY GENERAL FOR THE
        NATIONAL SECURITY DIVISION

By:    */s/ John Cella*
        John Cella
        Court ID No. A5503330
        James Donnelly
        Court ID No. A5503331
        Trial Attorneys
        Department of Justice, National Security Division
        950 Pennsylvania Avenue, NW
        Washington, DC 20530
        Telephone: (202) 514-0849

## **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on January 21, 2026, I filed the foregoing response with the Clerk of Court using CM/ECF.

                                                /s/ *John Cella*
                                                Trial Attorney
                                                Department of Justice, National Security Division